605 A.2d 681

THEODORE RUDBART, NATALIE RUDBART, BEVERLY LITOFF AND BENJAMIN WELTMAN, PLAINTIFFS–RESPONDENTS, v. NORTH JERSEY DISTRICT WATER SUPPLY COMMISSION AND FIRST FIDELITY BANK, N.A., N.J., DEFENDANTS–APPELLANTS.

MADELINE OKIN, FOR HERSELF AND ON BEHALF OF ALL OTHER PERSONS SIMILARLY SITUATED, PLAINTIFF–RESPONDENT, v. NORTH JERSEY DISTRICT WATER SUPPLY COMMISSION AND FIRST FIDELITY BANK, N.A., N.J., DEFENDANTS–APPELLANTS.

Argued January 3, 1991—Decided April 27, 1992.

*H. Curtis Meanor* argued the cause for appellant North Jersey District Water Supply Commission (*Podvey, Sachs, Meanor & Catenacci,* attorneys; *H. Curtis Meanor, H. Richard Chattman,* and *Steven Firkser,* on the briefs).

*Michael A. Lampert* argued the cause for appellant First Fidelity Bank, N.A., N.J. (*Kraft & McManimon,* attorneys).

*James J. DeLuca* argued the cause for respondents (*Okin, Cohen & Hollander* and *Gurtman, Shurkin & Brunt,* attorneys; *Mr. DeLuca* and *Thomas J. Brunt,* on the briefs).

*Joseph L. Yannotti,* Deputy Attorney General, argued the cause for *amicus curiae* State of New Jersey, (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Michael R. Clancy,* Assistant Attorney General, of counsel; *Sandra L.K. Manning,* Deputy Attorney General, on the brief).

*Peter N. Perretti, Jr.,* submitted briefs on behalf of *amici curiae* New Jersey Bankers Association and American Bankers Association, (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Peter N. Perretti, Jr., Robert Fischer, III, John J. Farmer, Jr.,* and *David P. Arciszewski,* on the brief).

PER CURIAM.

We granted certification, 122 *N.J.* 137, 584 *A.*2d 210 (1990), primarily to consider the contention of First Fidelity Bank, N.A., New Jersey (Fidelity) that "in a published decision without precedent in the United States the Appellate Division had ruled that every investment security, whether a stock, bond, note or in some other form, is a contract of adhesion subjecting every term of the agreement to post hoc review for fairness." The Bank's petition for certification recited that "[n]ot only does this decision threaten to wreak havoc with the federally-regulated national securities market, but it would lead to the courts of this state being inundated with a group of law suits—securities litigation—that is among the most complex known to the bar."

█ We granted leave to the Attorney General of New Jersey to appear as *amicus curiae* because of his contention that

[t]his is the only decision extending the application of the doctrine of adhesion contracts to the sophisticated and highly-regulated world of securities transactions.

The decision has the potential of opening to scrutiny by the courts the terms and conditions of notes and securities that have been sold to the public by governmental agencies throughout the State. The transfer of securities in the primary and secondary market hinges upon the certainty of the terms of such securities, and the assurance that those terms cannot be overridden by judicial

fiat. The broad implications of the decision by the Appellate Division could adversely affect on the sale of securities in this State.

The Attorney General suggested that the public debt financing to support the vast number of programs and projects necessary to the public health and welfare of the state would be endangered by the decision below. We agree that the doctrine of adhesion contracts should not be extended to regulated securities transactions. We now reverse the judgment of the Appellate Division, which was based on that court's holding that the subject securities constituted a contract of adhesion, but remand the matter to the Law Division for resolution of the remaining claims asserted by the plaintiffs.

## I

These consolidated class actions were brought on behalf of holders of notes issued by defendant North Jersey District Water Supply Commission (Commission) to recover damages arising from an early redemption of the notes effected by newspaper notice. Plaintiffs' central claim was that notice by publication, although specifically provided for in the notes, was inadequate and unconscionable.

## A.

The Commission, a public corporation, operates and maintains a public water system serving northern New Jersey. *See N.J.S.A.* 58:5–1 to –58. By resolutions adopted April 25 and May 23, 1984, the Commission authorized the issuance of $75,000,000 in new project notes to provide interim financing for a portion of the cost of constructing a new water-supply facility and to pay certain outstanding obligations. *See N.J.S.A.* 58:5–44. The Commission and its underwriters, one of which was defendant Fidelity, negotiated the terms of the notes; Fidelity also was designated as the indenture trustee pursuant to *N.J.S.A.* 58:5–49 and as registrar/paying agent for the notes. The underwriters agreed to purchase the notes at the discount-

ed price of $73,800,000, intending to sell them on the secondary market at face value.

The project notes were issued on June 15, 1984. Issued in registered form, without coupons, in denominations of $5,000 or multiples thereof, the notes bore tax-free interest at the rate of 7⅞ per annum payable on June 15th and December 15th. The notes fixed a June 15, 1987, maturity date, but, as set forth in both the Commission's authorizing resolutions and the Official Statement offering the issue to the public, were subject to earlier optional redemption:

> The Notes are subject to redemption prior to maturity as a whole at the option of the Commission on 30 days published notice in a newspaper or newspapers of general circulation in the City of Newark, New Jersey and in the City of New York, New York on the dates and at the prices below:

| Redemption Period (both dates inclusive) | Redemption Price (percent of par value) |
| --- | --- |
| June 15, 1986 to December 14, 1986 | 101 % |
| December 15, 1986 and thereafter | 100½% |

> If on the date fixed for redemption sufficient monies are available to the Trustee to pay the redemption price plus interest accrued to the date of redemption, the Notes shall cease to bear interest and shall not be deemed to be outstanding from such date.

The back of each of the issued notes bore similar language.

In the summer of 1985, the Commission decided to redeem the notes prior to maturity. In keeping with the procedures established in its 1984 resolutions, the Commission entered into an escrow deposit agreement with Fidelity, effective September 26, 1985, for the redemption of the notes on June 23, 1986. Among its other terms, the agreement provided for the Commission to deposit with Fidelity an escrow sum sufficient to pay the redemption price and interest until the redemption date, and for Fidelity to publish a notice of redemption in accordance with the note terms.

Although regular interest payments were mailed to registered noteholders on December 15, 1985, and June 15, 1986, neither those nor any other mailings informed the noteholders of the forthcoming early redemption. Fidelity did, however, provide the required notice by publication in *The Star–Ledger*, *The New York Times*, and *The Wall Street Journal* on May 23 and again on June 9, 1986. The June 3, 1986, issue of *Moody's Municipal & Government Manual* also contained the call notice.

As of December 15, 1986, the holders of approximately $10,-000,000 of the notes still had not redeemed. A number of noteholders apparently made inquiries and complaints when they failed to receive their anticipated December 15, 1986, interest payments. Fidelity, at the Commission's request, mailed notice in early 1987 to those holders who had not yet redeemed, but declined the Commission's request to put the unredeemed funds in an interest-bearing account. The late-redeeming noteholders received the redemption price (101% of face value) and interest from June 15 to June 23, 1986, the date of redemption.

Plaintiffs filed separate actions in February and April 1987 on behalf of noteholders who allegedly had not learned of the redemption until after December 15, 1986. On various theories of negligence, conversion, breach of trust, constructive trust, and reformation, plaintiffs demanded that they be paid interest at the $7\frac{7}{8}\%$ rate from June 23, 1986, until the dates that they submitted their notes for redemption or other appropriate relief. The two actions were consolidated for trial.

At about the same time, a third plaintiff brought suit on behalf of late-redeeming noteholders in the United States District Court, *Ellovich v. First Fidelity Bank, N.A.*, No. 87–650 (D.N.J. Mar. 2, 1988). That case asserted federal securities-law claims as well as state-law causes of action. The district court dismissed the federal claims on a finding that the offering statement did not fail to disclose any material facts with respect to the nature and consequences of the early-redemption

notice by publication. The court then dismissed the state-law claims for lack of subject matter jurisdiction, stating that "[t]he state court is the proper forum for the litigation of these causes of action." The Third Circuit Court of Appeals affirmed. *Ellovich v. First Fidelity Bank, N.A.,* 862 *F.*2d 307 (1988).

The parties in the present actions then cross-moved for summary judgment on liability, based on a filed stipulation of facts. In a letter opinion, the Law Division held that "the notice provision clearly indicates that the newspaper publication method outlined would be the only type of notice given to the bond [sic] holders," and that "the failure to mail a notice to the plaintiffs when they could have, at the time they sent out interest checks," did not give rise to a cause of action. The Law Division granted summary judgment for defendants, finding that "the agreed upon notice by publication is binding on the plaintiffs and * * * such a method is not deficient as a matter of law." The court therefore entered judgment in favor of the Commission and Fidelity.

Before the Appellate Division, plaintiffs urged that the early-redemption notice by publication "was insufficient as a matter of law" and that the Commission and Fidelity had "converted [plaintiffs'] monies." They argued that the noteholders "had no power to negotiate with either the Commission or First Fidelity regarding the terms of the notes or the redemption provisions thereof," and that "[t]his is a classic example of a contract of adhesion." That was plaintiffs' first and entire reference to that theory of liability.

The Appellate Division adopted that theory. It reversed, holding that "a note or other security sold to the general investing public pursuant to standard form contractual provisions is a contract of adhesion"; that "[c]onsequently, if the security contains an unfair provision or the issuer fails to deal fairly with the investors, the issuer and its agents may be liable for any resulting damages"; and that "the failure * * * to give mail notice of the early redemption of the project notes was

unfair." *Rudbart v. North Jersey Dist. Water Supply Comm'n,* 238 *N.J.Super.* 41, 47, 568 *A.*2d 1213 (1990). The court reasoned that investment securities are generally "drafted by the issuer and presented to the purchaser on a take it or leave it basis," that the offering statements are "lengthy and difficult to understand," and that "members of the general investing public cannot reasonably be expected to understand the entire offering statement before deciding whether to purchase a particular security." *Id.* at 49, 568 *A.*2d 1213. Accordingly, courts should intervene "to afford protection to purchasers of securities from unconscionable contractual terms and other forms of overreaching by the issuers and their agents." *Ibid.* The Appellate Division went on to hold that "the notice by publication provided by defendants did not constitute fair notice of the early redemption," *id.* at 51, 568 *A.*2d 1213, and that "defendants did not show any legitimate business reason for failing to give notice by mail." *Id.* at 56, 568 *A.*2d 1213. The court thus reversed and remanded for the determinations of damages and their allocation as between the Commission and Fidelity. *Id.* at 57, 568 *A.*2d 1213.

We granted certification and the Commission's motion to supplement the record. We also granted leave to the State of New Jersey, the New Jersey Bankers Association, and the American Bankers Association to join as *amici curiae.*

## II

Plaintiffs do not contend that the project notes are ambiguous, nor do they claim that the Commission or Fidelity committed fraud or violated federal or state securities laws. Ordinarily, then, contract law would make the terms of the notes fully binding on plaintiffs. That law, based on principles of freedom of contract, was well stated in *Fivey v. Pennsylvania Railroad,* 67 *N.J.L.* 627, 52 *A.* 472 (E. & A. 1902), in which the court enforced a release incorporated in a standard-form contract:

A party who enters into a contract in writing, without any fraud or imposition being practiced upon him, is conclusively presumed to understand and assent to its terms and legal effect. [*Id.* at 632, 52 *A.* 472 (quoting *Rice v. Dwight Mfg. Co.,* 56 *Mass.* (2 Cush.) 80 (1848)).]

*See also Henningsen v. Bloomfield Motors, Inc.,* 32 *N.J.* 358, 386, 161 *A.*2d 69 (1960) ("the basic tenet of freedom of competent parties to contract is a factor of importance"); Friedrich Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract,* 43 *Colum.L.Rev.* 629, 630 (1943) (hereinafter Kessler) (traditional contract principle is that "once the objective manifestations of assent are present, the author is bound").

■ If an agreement is characterized as a "contract of adhesion" however, nonenforcement of its terms may be justified on other than such traditional grounds as fraud, duress, mistake, or illegality. *See* Todd D. Rakoff, *Contracts of Adhesion: An Essay in Reconstruction,* 96 *Harv.L.Rev.* 1174, 1190–92 (1983) (hereinafter Rakoff). Although the term "has acquired many significations," *id.* at 1176, the essential nature of a contract of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the "adhering" party to negotiate except perhaps on a few particulars. *Id.* at 1177; 3 *Corbin on Contracts* § 559C (Supp.1991); Kessler, *supra,* 43 *Colum.L.Rev.* at 632; Albert A. Ehrenzweig, *Adhesion Contracts in the Conflict of Laws,* 53 *Colum.L.Rev.* 1072, 1075 (1953); W. David Slawson, *Standard Form Contracts and Democratic Control of Lawmaking Power,* 84 *Harv.L.Rev.* 529, 530 (1971) (hereinafter Slawson). We have previously defined "contract of adhesion" in just those terms: "[a] contract where one party * * * must accept or reject the contract * * *." *Vasquez v. Glassboro Serv. Ass'n,* 83 *N.J.* 86, 104, 415 *A.*2d 1156 (1980). Such a contract "does not result from the consent of that party." *Ibid.; see also* Slawson, *supra,* 84 *Harv.L.Rev.* at 530 (standard form contracts "are not, under any reasonable test, the agreement of the consumer or business recipient to whom they are delivered"). The distinct body of law surrounding contracts of adhesion represents the legal system's effort to determine

whether and to what extent such nonconsensual terms will be enforced. Rakoff, *supra*, 96 *Harv.L.Rev.* at 1230.

■ The project notes involved here unquestionably fit our definition of contracts of adhesion. That is, they were presented to the public on standardized printed forms, on a take-it-or-leave-it basis without opportunity for purchasers to negotiate any of the terms.[1] But the observation that the notes fit the definition of contracts of adhesion is the beginning, not the end, of the inquiry: we must now determine as a matter of policy whether to enforce the unilaterally-fixed terms of the notes.

We have discussed those considerations in a number of earlier cases. The seminal case is *Henningsen, supra,* 32 *N.J.* 358, 161 *A.*2d 69, in which we invalidated an automobile manufacturer's standard-form disclaimer of its implied warranty of merchantability. In justifying that deviation from ordinary contract-law principles, we noted that a car is "a common and necessary adjunct of daily life," *id.* at 387, 161 *A.*2d 69, that the disclaimer form was used by the manufacturers of virtually all American passenger cars, *id.* at 390, 161 *A.*2d 69, that the "gross inequality of bargaining position * * * is thus apparent," *id.* at 391, 161 *A.*2d 69, and that the disclaimer represented "a studied effort to frustrate" the legislative grant of implied-warranty protection. *Id.* at 404, 161 *A.*2d 69.

In *Ellsworth Dobbs, Inc. v. Johnson,* 50 *N.J.* 528, 236 *A.*2d 843 (1967), we similarly invalidated a provision of a standardized real-estate-brokerage contract that obligated the seller to

---

[1] The Commission and the underwriters negotiated the terms of the notes. However, although the underwriters presumably sought to enhance the attractiveness of the offer to prospective purchasers, the record does not indicate whether the negotiation addressed the interests of individual noteholders with respect to the form of early redemption notice or otherwise. *See* Lawrence E. Mitchell, *The Fairness Rights of Corporate Bondholders,* 65 *N.Y.U. L.Rev.* 1165, 1183 (1990). We thus reject defendants' suggestion that the noteholders had in fact negotiated the notice provision through the underwriters.

pay a commission even if the buyer was financially unable or unwilling to complete the transaction. Relying on the "undue advantage" that arose from "monopolistic or practical control in the business transaction involved," *id.* at 553, 236 *A*.2d 843, we held that the offending contractual term would "thwart" the judicially-declared public policy of the State. *Id.* at 552, 555, 236 *A*.2d 843. Such a contractual provision accordingly is unenforceable "[w]henever there is substantial inequality of bargaining power, position or advantage between the broker and the other party involved." *Id.* at 555, 236 *A*.2d 843.

We applied similar principles in *Shell Oil Co. v. Marinello*, 63 *N.J.* 402, 307 *A*.2d 598 (1973), *cert. denied*, 415 *U.S.* 920, 94 *S.Ct.* 1421, 39 *L.Ed.*2d 475 (1974), to invalidate the termination provision of an oil company's lease and dealer agreement. We described the oil company as "the dominant party," and found that its relationship with its dealer "lacks equality in the respective bargaining positions"; moreover, a dealer who has operated the station for a period of years "cannot afford to risk confrontation with the oil company." *Id.* at 408, 307 *A*.2d 598. Because the parties' "grossly disproportionate bargaining power" had produced a "grossly unfair" term that contravened "the extant public policy of this State," we did not enforce that term. *Id.* at 408–09, 307 *A*.2d 598.

We again explored contracts of adhesion in *Vasquez, supra*, 83 *N.J.* 86, 415 *A*.2d 1156, in which we denied enforcement of a provision in a migrant worker's contract permitting eviction of a worker immediately on termination of his employment. We noted that contracts should be enforced where "the parties are in positions of relative equality and * * * their consent is freely given." *Id.* at 101, 415 *A*.2d 1156. However, we found that the migrant farmworker was in a position "analogous to that of a consumer who must accept a standardized form contract to purchase needed goods and services." *Id.* at 103, 415 *A*.2d 1156. We also found that the eviction terms of the standard-form contract conflicted with the demonstrated policy of the New Jersey courts and Legislature "in providing legal protec-

tion for migrant farmworkers." *Id.* at 99, 415 *A.*2d 1156. Because the contract "[did] not result from the [worker's] consent," we invalidated its "unconscionable" eviction provision. *Id.* at 104, 415 *A.*2d 1156; *see also Kuzmiak v. Brookchester, Inc.,* 33 *N.J.Super.* 575, 111 *A.*2d 425 (App.Div.1955) (lease provision exculpating residential landlord from liability held contrary to public policy).

■ Thus, in determining whether to enforce the terms of a contract of adhesion, courts have looked not only to the take-it-or-leave-it nature or the standardized form of the document but also to the subject matter of the contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the "adhering" party, and the public interests affected by the contract. Applying those criteria to the project notes, we find insufficient reason to invalidate the notice-by-publication term.

### III

■ The three considerations that lead us to that conclusion derive primarily from the fact that the project notes were publicly-traded securities. First, no investor was under any economic pressure to buy the notes. The notes were not consumer necessities. Prospective investors could choose from a vast selection of alternative equity and debt investments, including bonds and notes with various call and notice provisions. They were not driven to accept the Commission's notes because of a monopolistic market or any other economic constraint. Accordingly, the Commission did not enjoy a superior bargaining position permitting it to dictate its own terms. In short, the principal justifications for invalidating terms of a contract of adhesion are simply not present in a fully open and competitive securities market. Professor Slawson has cogently explained that reality:

What economists call "perfectly competitive markets" (the markets for commodities or corporate securities, for example) automatically balance supply and

demand at a "market price," below which no buyer can hope to buy and above which no seller can hope to sell. A buyer for whom the products on such a market are essential buys them at prices and with other terms of sale that are adhesive, since he has no reasonable choice but to buy and, when he buys, no reasonable choice but to pay the prices and accept the other terms set by the market. Similarly, a seller for whom selling the product is essential sells at prices and other terms that are adhesive for him. But if the market is working free from improper influence, its lawmaking is legitimate. It is the mechanism through which society has implicitly chosen to enforce on buyers and sellers alike the prices and terms that meet the standards of supply and demand. Society has decided through its legitimate democratic processes that it wants those prices and terms imposed because theory teaches that they tend toward an optimum allocation of resources and are an incentive to efficiency. This decision serves as a standard of legitimacy, and since the contract is within this standard, it is legitimate and should be enforced. [Slawson, *supra*, 84 *Harv. L.Rev.* at 553–54.]

*Cf. Madden v. Kaiser Found. Hosps.*, 17 *Cal.*3d 699, 131 *Cal.Rptr.* 882, 552 *P.*2d 1178 (1976) (where employee could select among several medical plans, some without arbitration provisions, arbitration provision of plan selected would be enforced against him).

Second, although securities are offered to the public on a take-it-or-leave-it basis, enforcement of their terms advances rather than contravenes well-established and important public policies. Securities are governed by Article 8 of the Uniform Commercial Code, *N.J.S.A.* 12A:8–101 to –408. *See N.J.S.A.* 12A:8–102; *N.J.S.A.* 12A:8–105(1). The Legislature has mandated that terms incorporated in such instruments shall be effective "[e]ven against a purchaser for value and without notice." *N.J.S.A.* 12A:8–202(1). That provision, unique to investment securities and unlike the general Uniform Commercial Code principle that "[a] person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it," *N.J.S.A.* 12A:1–201(25), is designed to provide certainty and stability in the marketing of securities. Its purpose is explained in the Official Comment:

A purchaser must have some method of learning the terms of the security he is purchasing. The printing on the certificate or on the initial transaction statement ("ITS") is designed to notify the purchaser of those terms. If he purchases without examining the certificate or ITS, he does so at his peril, since

he is charged with notice of terms stated thereon. [*U.C.C.* § 8–202 cmt. 1 (1977).]

We have recently observed that "the U.C.C. represents a comprehensive statutory scheme that satisfies the needs of the world of commerce, and courts should pause before extending judicial doctrines that might dislocate the legislative structure." *Spring Motors Distribs., Inc. v. Ford Motor Co.,* 98 *N.J.* 555, 577, 489 *A.*2d 660 (1985). The aim of Article 8 is to confer negotiability on securities; the statutory provisions should be implemented to ensure " 'the freedom of transferability which is essential to the negotiability of investment securities.' " 8 Anderson, *Uniform Commercial Code* § 8–105:3, :4 (3d ed. 1985) (quoting *E.H. Hinds, Inc. v. Coolidge Bank & Trust Co.,* 6 Mass.App. 5, 372 *N.E.*2d 259, 263 (Mass.App.Ct.1978)). Subjecting the terms of Article 8 securities to continual judicial determinations of fairness would seriously impair the reliability and transferability of such instruments.[2]

Third, judicial review of the fairness of negotiable securities would be inconsistent with federal and state securities laws. Central to those statutes is the requirement of full disclosure of all material facts and the prohibition of fraudulent conduct in connection with the purchase or sale of securities. *See* 15 *U.S.C.A.* § 78j(b); *N.J.S.A.* 49:3–52(a) and (b). Both Congress and our Legislature have chosen to protect investors by assuring that they be given all materials necessary to make an informed decision; accordingly, the federal and state legislative schemes do not provide for governmental review—judicial or otherwise—of the risk, fairness, good sense, or other substantive qualities of the offered security. Introducing a judicial-fairness review would effectively reject those legislative judg-

---

[2]Subjecting Commission notes to a judicial-fairness review could also undermine the statutory assurance that "[all] * * * provisions" of such obligations are "valid and legally binding contracts * * * enforceable by any * * * holder or holders." *N.J.S.A.* 58:5–48.

ments in favor of a view that full disclosure does not provide adequate protection to an investor.[3] Similarly inappropriate is the Appellate Division's suggestion that terms of securities should be subject to a judicial-fairness review because the documents "are lengthy and difficult to understand." 238 *N.J.Super.* at 49, 568 *A.*2d 1213. The forms of documents are dictated by, and their sufficiency is reviewable under, the securities laws.

We are satisfied that in light of the considerations we have stated, the asserted unfairness of the notice provision is not sufficient to justify judicial intrusion. Notice by publication does not contravene or frustrate any legislative policy. Moreover, although such notice may be constitutionally insufficient in certain settings, see, e.g., *Mullane v. Central Hanover Bank & Trust Co.*, 339 *U.S.* 306, 70 *S.Ct.* 652, 94 *L.Ed.* 865 (1950), plaintiffs have not demonstrated any established judicial policy against contractual provisions for notice by publication. We recognize that the Securities and Exchange Commission's recent guidelines for bond redemptions, SEC Exchange Act Release No. 23, 856 (Dec. 3, 1986), encourage notice by mail and that the Model Debenture Indenture Provisions of the American Bar Foundation, American Bar Foundation Corporate Debt Financing Project, *Model Debenture Provisions—All Registered Issues* § 1105 at 68 (1967), also suggest that notice of early redemption should be given to registered holders by mail. Moreover, we have no doubt that notice by mail here would have been preferable. But those considerations are not of sufficient weight to overcome the policy considerations that

---

[3]The ability of the courts to conduct such evaluations of securities is, at the very least, questionable. Some state securities laws do provide for a fairness review, commonly performed by a specially-constituted executive commission prior to the issuance of a security. That procedure not only provides some degree of expertise and consistency but also assures that an investor can still rely on the express terms of the security once issued. *See* Louis Loss, *Fundamentals of Securities Regulation* 13 n. 21 (1988).

properly restrain judicial oversight of the terms of publicly-traded securities.[4]

We do not read *Van Gemert v. Boeing Co.*, 520 *F.*2d 1373 (2d Cir.), *cert. denied*, 423 *U.S.* 947, 96 *S.Ct.* 364, 46 *L.Ed.*2d 282 (1975), relied on by plaintiffs, as holding that a court may properly invalidate a notice-by-publication term of a security. In *Van Gemert*, holders of Boeing's convertible debentures challenged as unreasonable the published notice given by Boeing of redemption of the debentures. Although the plaintiffs argued that the indenture agreement was "in the nature of a contract of adhesion" and thus any "unconscionable features * * * are unenforceable as a matter of policy," *id.* at 1380, that court did not agree. Rather, it found that the newspaper notice was inadequate because the investors had not been adequately informed "by the prospectus or by the debentures" of the notice to be given. *Id.* at 1383. The court classified the limited scope of that holding in its later opinion after remand. *See* 553 *F.*2d 812 (1977). There the court stated that it had found "significant * * * the fact that the debentures did not explicitly set forth the type of notice [that the debenture holders] could expect" in the event of an early redemption, and accordingly had "held as a matter of law" what notice the debenture holders "were entitled to expect." *Id.* at 815. See also *Meckel v. Continental Resources Co.*, 758 *F.*2d 811 (2d Cir.1985), in which the same court described the *Van Gemert* holding as follows:

> Those debentures contained no indication as to the type of notice of redemption that was to be provided. It was the total lack of a notice provision in the debentures that we held necessary as a condition precedent to an imposition of a duty to provide "reasonable" notice. [*Id.* at 816.]

As we have already noted, plaintiffs here do not dispute that the notes and the Official Statement fully disclosed that notice

---

[4]We also note that in the special circumstances of this case, invalidation of the "notice" provision might have a peculiarly unfortunate effect: the Commission, a public agency, and hence its ratepayers, might be required to pay interest on an escrow fund that was not under its control and that may have generated no income for the Commission.

of redemption would be given by publication. If anything, *Van Gemert* suggests that such a fully disclosed term should be enforced.

We therefore conclude that although the project notes fit our literal definition of contracts of adhesion, plaintiffs are bound by the provision for notice by publication because of the unique policy considerations attendant on securities offerings.

## IV

■ Having disagreed, then, with the Appellate Division's sole basis for its decision, we would ordinarily remand the matter to the Appellate Division for consideration of whether plaintiffs' complaint stated a cause of action for relief on any of the other theories pleaded, *supra* at 351, 605 *A*.2d at 684, such as negligence, conversion, or constructive trust. Because the case is now more than five years old, we believe it best to resolve those claims on the record before us. After oral argument, we afforded the parties and the *amici* the opportunity to file supplemental briefs on any theory of liability or defense previously pleaded.

■ Although we disagree with our concurring member, Judge Petrella, on the issue of whether the notice provisions of these notes should be enforced, we agree with that part of his factual analysis that demonstrates the overwhelming inequity of allowing Fidelity to notify its customers of the redemption date while keeping the other investors in the dark and, as a result, perhaps benefiting from the use of the retained money. Because the trial court granted defendants' motion for summary judgment, we must grant to plaintiffs all the inferences that are favorable in the circumstances of this case.

Judge Petrella has outlined that Fidelity wore many hats with respect to this transaction. As an underwriter, it earned income (although it undoubtedly incurred a risk) by subscribing to a percentage of the notes for resale to its customers or for its own account. In addition, it served as an indenture trustee,

which we take to mean that plaintiffs' money was to pass through Fidelity's hands as a stakeholder or escrow agent for the benefit of the noteholders. We believe that familiar principles of constructive trust apply to this latter function and entitle plaintiffs to at least a partial return of the interest earned on their money while it was retained by Fidelity.

Although plaintiffs' Appellate Division brief may inartfully describe their complaint as "establish[ing] a cause of action for conversion," the relief that they plainly sought under the first and third counts of the complaint established the theory of constructive trust as an alternative basis for relief. In their supplemental memorandum, plaintiffs asked the Court as an alternative to the 7⅞% interest under the notes, that they be awarded the "interest on such [unredeemed] funds" by virtue of a general duty of a trustee to invest funds of a beneficiary. For while plaintiffs sought to "reform the terms of the notes issued to require notice by mail," they also sought to "impos[e] a constructive trust upon the unclaimed funds with all interest accrued thereon." With all of the favorable inferences that we must accord to plaintiffs' proofs, their complaint surely sets forth a claim to at least a partial return of any interest earned on these funds. Fidelity asserts that it deposited those funds in a non-interest-bearing account. There is no such thing as a non-interest-bearing account, for even those accounts that are denoted "non-interest-bearing" generate money for someone. For a bank, it might mean a change in margin requirements. The *amici*, American Bankers Association and New Jersey Bankers Association, make reference to the "float" on the unredeemed funds. Of such things we do not know but the clear implication is that interest was earned on those funds. We do know that in the companion litigation in the United States District Court, plaintiffs contended that the defendants' failure to state that the bank, not the investors, would earn interest on funds remaining unclaimed after any optional redemption constituted a material misrepresentation in violation of SEC *Rule* 10b–5.

The district court concluded as a matter of law that *Rule* 10b–5 did not require the bank to disclose the fact that it would earn interest on the unclaimed deposits. That the bank was not required by federal law to disclose that fact does not entitle it to retain all the interest earned on the funds.

The Law Division misperceived plaintiffs' claims to be limited to the demand that they be paid interest at the 7-⅞% interest rate from June 23, 1986, until they submitted their notes for redemption. As plaintiffs argued in their Appellate Division brief, all that need be established on those counts of the complaint asserting "conversion" of the funds was that "to allow either the Commission or Fidelity to *benefit* as a result of their failure to provide adequate notice of the redemption to the noteholders" would be unjust. (Emphasis added). Plaintiffs pointed out that Fidelity had held the escrow account "as a trust fund separate and apart from all other funds of the Commission or of the escrow account of First Fidelity for the sole benefit of the prior noteholders [holders of the 1984 project notes]."

As we have repeatedly emphasized, the concept of a constructive trust " 'is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them.' " *Bron v. Weintraub*, 42 *N.J.* 87, 96, 199 *A*.2d 625 (1964) (quoting *Latham v. Father Divine*, 299 *N.Y.* 22, 85 *N.E*.2d 168, 170 (1949)). In the circumstances of this case, there can hardly be any doubt that this was a highly unusual situation in which one of the defendants was aware that it was holding other people's money as a result of selective unfairness. Deposition testimony of Alex Williams, Executive Vice–President of Fidelity, revealed that the bank's investment department gave written or oral notice to its customers prior to the June 23, 1986 call date that the notes had been called. This notice was given whether or not those customers had safekeeping accounts with the bank. Williams stated that Fidelity felt it would be "good business" to inform its customers. According to Williams, Fidelity took this action essentially

because the bank wanted to sell new bonds to its customers, to continue good customer relations, and to insure that its customers received notice. How far in advance of the June 23, 1986 call date Fidelity began notifying its customers is unclear. Williams also expressed the opinion, in response to the questions of the bank's attorney, that Fidelity maintained the list of purchasers of the project notes in connection with its underwriting activities for the issuance of the notes. When asked if he could have obtained that information from the trust department, he speculated that the trust department would have said "[i]t would have been a conflict of interest on their part. I don't know what they would have said because we didn't ask for it." [5] If as the *amici*, Bankers' Associations suggest, an agreement on the "float" may have been part of the transaction between Fidelity and the Commission, a further tension in Fidelity's duties would be created.

Charles Hoos, Senior Vice–President of Fidelity, testified that he was in charge of the corporate trust department and was aware that Fidelity had elected to give written notice of the redemption of the notes to customers of its investment department. Fidelity took the position before the Law Division, and in a September 9, 1988 letter brief following the oral argument there, that nothing in the record indicated that the personal notifications given by the investment department of the bank were in any way a result of the bank's position as trustee. It pointed to the deposition testimony of Fidelity's personnel that the investment department routinely telephones customers with respect to any major developments as to securities it sold. Fidelity took the position that the deposition testimony demonstrated that a "Chinese wall" existed between the trust depart-

---

[5] Williams's statement is premised on principles of fiduciary law that Fidelity at other points disavows, despite its designation as "trustee," the fact that under the resolutions it was holding funds "in trust," and the heading "The Fiduciaries" in the Commission's resolution of April 25, 1984, which Fidelity apparently accepted. Moreover, the September 1, 1985, Escrow Deposit Agreement refers to the bank "in its capacity as trustee."

ment and the investment department that was kept intact during this transaction.

As trustee under the note issue (as well as in the other capacities) Fidelity presumably received significant fees for its responsibilities, which in part included protecting the rights of noteholders. In that fiduciary capacity, for which it was paid, Fidelity now insists that it had no obligation to notify any noteholders in any fashion other than by the method of publication as set forth in the Commission's resolution. On the other hand, Fidelity admits that in its capacity as a bank, its investment department, which also receives fees for its services, including protection of customers, apparently undertook to give special notice to its own customers past and potential, with no obligation to do so. *See Rudbart, supra,* 238 *N.J.Super.* at 51 n. 4, 568 *A.*2d 1213. Thus, Fidelity argues that it can demand the benefits of both worlds, but without any additional obligations, particularly toward those who did not purchase the notes through it.

We need not debate whether an indenture trustee may be held to any fiduciary duty beyond that spelled out in the trust agreement. It is one thing not to surcharge a trustee for such an omission; it is quite another to let a trustee profit unfairly from a lack of fair dealing with the beneficiaries of its trust. The fact is that Fidelity decided to notify selectively its own customers. It acted in a manner that exhibited at least a lack of fair dealing and possibly a lack of good faith. This is a compelling case in which to apply the fairness doctrine because Fidelity was aware of the noteholders' lack of notice but acted for only its own customers. Although Fidelity acted in multiple capacities it should not be allowed to assume duties with one hand and to reject them with the other to its own unjust enrichment.

In unjust-enrichment cases courts may presume that the parties " 'intended to deal fairly with one another [and will] employ the doctrine of *quantum meruit* [ ] or equitable reme-

dies such as constructive or resulting trusts' in order to ensure that one party has not been unjustly enriched, and the other unjustly impoverished, on account of their dealings." *Carr v. Carr*, 120 *N.J.* 336, 352, 576 *A.*2d 872 (1990) (quoting *Kozlowski v. Kozlowski*, 80 *N.J.* 378, 390–91, 403 *A.*2d 902 (1979) (Pashman, J., concurring)). That principle of fair dealing pervades all of our contract law. *See Palisades Properties, Inc. v. Brunetti*, 44 *N.J.* 117, 207 *A.*2d 522 (1965). Although that principle will not alter the terms of a written agreement, *Marini v. Ireland*, 56 *N.J.* 130, 143, 265 *A.*2d 526 (1970), allowing plaintiffs some portion of the return on their withheld funds does not in any sense alter the written terms of the agreement between these parties. Here, the bank knew or should have known that a large percentage of the noteholders would fail to receive notice of the early redemption, and knew exactly who they were. Nonetheless Fidelity did not take any steps to minimize the consequences of that failure, except to notify only its clients.

We can think of no fair reason, then, for holding that either defendant should be entitled to all of the income on plaintiffs' unredeemed funds. Surely, Fidelity recognized that it was a sound business practice and therefore fair dealing to assume that the customers to whom it sold a share of the notes should receive additional notice of the redemption. This multi-hatted trustee cannot simply pick and choose among those with whom it had contractual relationships without invoking the law's concern for "bringing about justice without reference to the intention of the parties." *St. Paul Fire & Marine Ins. Co. v. Indemnity Ins. Co. of N. Am.*, 32 *N.J.* 17, 22, 158 *A.*2d 825 (1960). There might be a case in which administrative inconvenience in calculating interest to noteholders who straggle in might justify a denial of any interest. But this is not such a case. The sums involved here were, by the Commission's own account, described in depositions as "astronomical."

In short, this case was far from ripe for summary disposition. No affidavit before this Court has resolved the question of

whether a profit was made on the unclaimed funds (once as high as $25,000,000). Clearly, if the Commission shared any of the benefits with Fidelity it should be required to disgorge that amount. The pleadings and the depositions set forth an actionable claim for some equitable share of any income earned on plaintiffs' funds. Because the liability we impose results from Fidelity's decision to prefer its customers over other noteholders so that its noteholders could redeem by June 23, 1986, that date should be the beginning point in calculating profit earned on the unclaimed funds. Plaintiffs suggest that the trial court should allow some reasonable time, after the June 23, 1986 redemption date, within which to expect that the funds would have been invested. Because we impose no duty on the fiduciary for failure to invest the funds, the use of the redemption date will simplify the remand. All that need be done is to determine what profit accrued to whom from the retention of plaintiffs' funds. Fidelity should be allowed all of its reasonable expenses but for any possible benefits it has unjustly accrued. Obviously, as the Commission points out, the funds had to be kept in liquid or very "short-term" investments or "overnights." We expect that the parties can readily develop the record necessary to conclude the matter with respect to this issue. We do not predicate our holding on 12 *C.F.R.* § 9.10 or *N.J.S.A.* 17:9A–35(D), although we note that both appear to assume that unclaimed fiduciary funds will not have been held uninvested, will reflect "short-term" market rates, and will allow for recognition of the fiduciary's cost or compensation for the services. Nor do we intend to create in this case, at this late date, a cause of action for breach of such directives. We intend only to remedy any unjust enrichment.

If the proofs disclose that the funds lay fallow and no benefit accrued to any of the defendants, then the court should dismiss the claims. We thus foresee no need for the trial court to have to resolve any issues of indemnification. By definition, it would appear that Fidelity will have suffered no loss (and needs no indemnification) when it disgorges only profit unjustly earned

on plaintiffs' funds. In addition, the court may choose to fashion a class remedy without requiring any further administrative effort by defendants, and determine a reasonable allocation, even if by rough measure, among the plaintiffs' claims.

The judgment of the Appellate Division is reversed. The matter is remanded to the Law Division for further proceedings in accordance with this opinion.

The Chief Justice, Justices Handler and O'Hern, and Judges Gaulkin and Keefe join in Parts I, II, and III of the opinion. The Chief Justice, Justices Handler and O'Hern, and Judge Petrella join in Part IV.

Judge Petrella dissents from Parts I, II, and III of the opinion and files a separate opinion.

Judge Gaulkin files a separate opinion in which Justice Clifford and Judge Keefe join on the issue in Part IV of the opinion. They would enter judgment for the defendants.

Justice Clifford files a separate dissenting opinion and would enter judgment for the defendants for the reasons stated in his separate opinion.

PETRELLA, P.J.A.D. (temporarily assigned), concurring in part and dissenting in part.

Because I am unable to agree fully with the Court's conclusions, I concur in part IV of the opinion and vote for that result, but I dissent from parts I through III. In my view, the "contract" under which the registered bearer notes were purchased by individuals or institutions is one of adhesion. That the notice provisions of the contract are not necessarily "unconscionable" does not resolve the issue of whether those provisions, if patently unfair to registered note holders under the circumstances, warrant judicial intervention.

In simplest terms a contract of adhesion, looked at from the dominant party's view, is merely one in which one party "adheres" to the terms which that party proposes, and does not

allow any realistic change or changes in the contract. See 3 *Corbin on Contracts* § 559A through I (Supp.1991); Rakoff, *Contracts of Adhesion: An Essay In Reconstruction,* 96 *Harv.L.Rev.* 1174 (1983). The non-dominant party is left with little, if any, choice and must, if desiring to contract, adhere to the contract terms with but minimal, if any, bargaining ability. *Black's Law Dictionary* (5th ed. 1979), defines the term "adhesion contract" as follows:

> Standardized contract form offered to consumers of goods and services on essentially 'take it or leave it' basis without affording consumer realistic opportunity to bargain and under such conditions that consumer cannot obtain desired product or services except by acquiescing in form contract. Distinctive feature of adhesion contract is that weaker party has no realistic choice as to its terms. * * * Not every such contract is unconscionable. [*Id.* at 38 (citations omitted).]

I disagree with the majority's notion that it is significant that investors were not under any economic pressure to buy the project notes. Contrary to the majority opinion's view, the fact that consumer necessities are not involved should not be determinative of the issue. Contracts of adhesion are not limited to contracts for necessities or policies of insurance unless the Legislature, or perhaps a court, so declares based on stated policy reasons. In my view, there is neither viable reason nor necessity to exclude securities from contract scrutiny. Hence, applying definitional terms, investment securities of the type involved in this case are contracts of adhesion and should be treated as such unless specifically provided otherwise by statute.

Investment securities of a New Jersey issuer, including the type involved in this case, are subject to Article 8 of the New Jersey Uniform Commercial Code (UCC) as in effect at the pertinent times involved in this litigation. *N.J.S.A.* 12A:8–106[1] (as in effect prior to January 16, 1990), stated:

---

[1]The note holders here are governed by the provisions of that section in effect prior to a 1990 amendment. That section was amended by *L.* 1989, *c.* 348, § 7, effective January 16, 1990, to read:

The validity of a security and the rights and duties of the issuer with respect to registration of transfer are governed by the law (including the conflict of law rules) of the jurisdiction of organization of the issuer.

The validity of the project notes issued on June 15, 1984, and the *rights* of the *issuer* regarding registration of transfer are not at issue here. The issue is the fairness or reasonableness of notice to a registered note holder solely by publication on May 23, 1986, and June 9, 1986, in two newspapers published in New York City, New York, and one newspaper published in Newark, New Jersey.[2] This fairness-of-notice concept is readily encompassed within the ambit of the "duties of the issuer with respect to registration of transfer," which are determined as to this issuer (the Commission) and these project notes by the laws of this jurisdiction.

It is unnecessary to conclude that the notice by publication provision, despite any inherent unfairness or unreasonableness, is unconscionable. The organic law of this State and its statutes and case law apply, including the provisions of Article 1 of the UCC (generally applicable to all the UCC articles, except where stated to the contrary, see A. Abrams, *Introductory Commentary* to *N.J.S.A.* 12A:1–101 *et seq.*). See *N.J.S.A.* 12A:1–102.

*N.J.S.A.* 12A:8–202 does not limit inquiry into the issue of the fairness of notice provisions, particularly in light of the perti-

---

The law (including the conflict of laws rules) of the jurisdiction of organization of the issuer governs the validity of a security, the effectiveness of registration by the issuer, and the rights and duties of the issuer with respect to:

(a) Registration of transfer of a certificated security;

(b) Registration of transfer, pledge, or release of an uncertificated security; and

(c) Sending of statements of uncertificated securities.

This appeal does not involve the validity of the security. It involves the effectiveness of registration by the issuer as well as the rights and duties of the issuer with respect to transfer of a certificated security.

[2]The call notice was also published in *Moody's Municipal & Government Manual* on June 3, 1986.

nent language of *N.J.S.A.* 12A:8–106, which, as in effect at the pertinent times involved, applied New Jersey law to this issue of notes and the rights and duties of this issuer. *N.J.S.A.* 12A:8–202 makes various terms of the security applicable "[e]ven against a purchaser for value and without notice." The thrust of that section is to establish the right of an issuer to incorporate terms by reference to other documents or legal authorities. It does not affect challenges to the validity of the issue or security. *N.J.S.A.* 12A:8–202 recognizes the applicability of a state "constitution, statute, ordinance, rule, regulation, order or the like to the extent that the terms so referred to do not conflict with the stated terms." [3]

Certainly, application of the law of fair notice does not conflict with the stated terms of these securities. Publication should not be construed as a stated term, nor as being to the exclusion of fair notice to registered note holders, nor as inconsistent with mailed notice. To expect that the absence of a reference to any of the cited authorities would mean other provisions of law have been ceded to the exclusive discretion of private law-making, *i.e.*, contract law, does not seem logical. Indeed, this section of the UCC has been interpreted as dealing with rights against the issuer, UCC § 8–202 (official comment). Because I would not construe Article 8 of New Jersey's UCC as limiting review of the fairness of the notice provisions for registered note holders whose names and addresses are readily ascertainable, I see no impediment to applying established principles of law to the notice.

---

[3]The legal opinion attached to the offering statement recites, among other things, that the "notes have been duly and validly authorized and issued in accordance with the Constitution, the Act and the applicable statutes of the State of New Jersey and in accordance with the Resolution; ..." It goes on to state: "The enforceability of rights or remedies with respect to the Notes and with respect to the Contracts may be limited, however, by bankruptcy, insolvency, moratorium or other laws heretofore or hereby enacted affecting creditors' rights or remedies; ..." That is an acknowledgement that the notes are subject to law, including case law.

372

It needs to be emphasized that this appeal does not involve the financial provisions of the notes, the validity or genuineness of the notes, negotiability, or defenses of the issuer.

There is no basis in this record, based apparently on a "Stipulation of Facts,"[4] to conclude that the Appellate Division's determination in this case of unfair notice to registered note holders would have any adverse effect on the issuance of municipal securities. Indeed, since the January 19, 1990, decision of the Appellate Division, nothing has been brought to the attention of this Court regarding any untoward consequence of that decision on the issuance of tax exempt securities in this state, other than some *ipse dixit* speculative arguments. It was essentially conceded at arguments before the Appellate Division and this Court that, as a practical matter, what happened in this case would not be repeated because written notice to all holders of registered securities is now the general rule, as well as the strong suggestion in "guidelines" (with virtually the force of regulations) of the Federal Securities and Exchange Commission. See 238 *N.J.Super.* at 52, 568 *A.*2d 1213. The record before the Appellate Division demonstrated a total lack of fair dealing with respect to the registered note holders as to the adequacy of the notice given. *Van Gemert v. Boeing Co.,* 520 *F.*2d 1373 (2d Cir.), *cert. denied,* 423 *U.S.* 947, 96 *S.Ct.* 364, 46 *L.Ed.*2d 282 (1975) (involving convertible debentures), and its progeny, on which the Appellate Division relied (see 238 *N.J.Super.* at 53–56, 568 *A.*2d 1213), present persuasive authority.

[4]The so-called stipulation submitted in plaintiffs' appendix bears no signatures and does not even contain a signature block for the Commission. Perhaps that was because the Commission did not participate in the proceedings before the trial court until a default was belatedly vacated before argument on the cross-motions for summary judgment. The Commission did not participate in the appeal before the Appellate Division. See 238 *N.J.Super.* at 47 n. 2, 568 *A.*2d 1213. The Commission's present attorneys were not involved in the earlier proceedings. At this Court's request, the attorneys for First Fidelity submitted a copy of a stipulation bearing the signatures of only plaintiffs' attorneys. In any event, no party disputes the stipulation.

The "Preliminary and Final Official Statement" dated May 16, 1984, on which defendants rely to support their claim that there was adequate notice and that plaintiffs individually, as well as all members of the class of registered note holders that they represent, should be bound by the contract, contains a provision somewhat inconsistent with defendants' argument. It provides that the "Official Statement is not to be construed as a contract or an agreement between the Commission and the purchaser or holder of any Notes...."[5]

If the offering statement is not considered to be part of any contract, then all that the purchaser is left with is the "fine print on the back of each note." 238 *N.J.Super.* at 44, 568 *A.*2d 1213. The record fails even to disclose whether plaintiffs received the offering statements before the purchase of the securities. See *Id.* at 49 n. 3, 568 *A.*2d 1213.

The Law Division judge appeared troubled at oral argument by the fact that First Fidelity Bank (First Fidelity) furnished its own customers with additional notice either by telephone or mail of the calling of the notes. The bank's attorney argued

---

[5]This official statement contains, among other things, the following disclaimers:

> The information and the expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement, nor any sale made hereunder, shall under any circumstances create an implication that there has been no change in the affairs of the Commission, the Bank or the WSP Contracting Municipalities since the date hereof.
>
> &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;
>
> This Official Statement is not to be construed as a contract or an agreement between the Commission and the purchaser or holder of any Notes. Any statements made in this Official Statement involving matters of opinion, whether or not expressly so stated, are intended merely as opinion and not as representations of fact. The information and the expressions of opinion herein are subject to change without notice and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Commission or the Bank since the date hereof.

then, and in a post-argument submission, that First Fidelity's trust department was separate and distinct from its investment department, was housed in a separate building, and was merely an "indenture trustee" and not a "common-law trustee." At that time, First Fidelity relied on a federal statute, presumably 15 *U.S.C.A.* § 77ooo(a)(1), and *Meckel v. Continental Resources Co.*, 758 *F.*2d 811, 816 (2d Cir.1985). Counsel also argued that the bank did not have fiduciary responsibilities.[6]

Deposition extracts submitted to the Law Division judge after oral argument (partially in response to deposition references in plaintiffs' brief) included portions of the testimony of Alex Williams, Executive Vice-president of First Fidelity, to the effect that at some point in 1986 the bank's investment department gave written or oral notice of the call of the notes to its customers whether or not those customers had safe-keeping accounts with the bank, and that this was done prior to the June 23rd call date. He said that First Fidelity felt that it would be "good business" to inform its customers. The reasons given by Williams for First Fidelity's actions were essentially that the bank wanted to sell new bonds to its customers, to continue good customer relations, and its concern that its customers might not receive notice. It is unclear how far in advance First Fidelity commenced notifying its customers of the June 23, 1984, call date. Williams also expressed the opinion, in response to the questions of the bank's attorney, that First Fidelity maintained the list of purchasers of the project notes in connection with its underwriting activities for the issuance of the notes. When asked if he could have obtained that information from the trust department, he speculated that the trust department would have said "[i]t would

---

[6]This argument may have been raised because of the existence of 12 *C.F.R.* § 9.10 and *N.J.S.A.* 17:9A–35(D), which seem to require investment of unclaimed fiduciary funds. These authorities were not brought to the court's attention by any party, and might well impact on the bank's obligations and duties here.

have been a conflict of interest on their part. I don't know what they would have said because we didn't ask for it." [7]

Charles Hoos, Senior Vice-president of First Fidelity, testified that he was in charge of the corporate trust department and was aware of the fact that First Fidelity elected to give written notice of the redemption of the notes to customers of its investment department.

The resolution adopted by the Commission on April 25, 1984, defined "fiduciary" as "the Trustee or Paying Agent." In section 504 of that resolution, as well as other sections, the trustee was charged with holding monies "in trust." Similar language appeared in Article VI of that resolution, entitled "The Fiduciaries," and also in a supplemental resolution dated May 23, 1984. Although the record does not contain the resolution appointing the bank as trustee or any document showing the trustee's actual acceptance of that appointment, it is undisputed that the bank acted not only as indenture trustee, and accepted responsibility under the resolutions, but also acted as a managing underwriter, Paying Agent, Registrar, and eventually Escrow Agent, and was presumably paid for each activity. A September 1, 1985, Escrow Deposit Agreement between the Commission and First Fidelity entered into in connection with First Fidelity being named "in its capacity as trustee" as "Escrow Agent" regarding the defeasance of the lien of the notes is attached as "Exhibit G" to the stipulation of facts.

First Fidelity took the position before the Law Division, and in a September 9, 1988, letter brief following the oral argument there, that nothing in the record indicated that the personal

---

[7]Williams' statement is premised on principles of fiduciary law that First Fidelity at other points disavows, despite its designation as "trustee," the fact that under the resolutions it was holding funds "in trust," and the heading "The Fiduciaries" in the Commission's resolution of April 25, 1984, which First Fidelity apparently accepted. Moreover, the September 1, 1985, Escrow Deposit Agreement refers to the bank "in its capacity as trustee."

notifications given by the investment department of the bank were in any way a result of the bank's position as trustee. It pointed to the deposition testimony of First Fidelity's personnel that the investment department routinely telephones customers with respect to any major developments as to securities it sold. First Fidelity took the position that the deposition testimony demonstrated that a "Chinese wall" existed between the trust department and the investment department that was kept intact during this transaction. It also claimed a narrower scope of responsibility as an indenture trustee as referred to in *Meckel v. Continental Resources, supra,* 758 *F.*2d at 816 (duties limited to duties set forth in indenture).

However, it was not First Fidelity's trust department that was appointed as trustee, but rather the bank. Indeed, if, as suggested in *Meckel,* an indenture trustee does not have a trustee's duties of undivided loyalty and "is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agent," *ibid.,* there is no need for the employment of a trust department and no need to hide behind one side of a "Chinese wall." First Fidelity was not only one of the underwriters, but it was one of the managing underwriters of this issue. It was also the registrar/paying agent, escrow agent, and the indenture trustee for the project notes. *Rudbart, supra,* 238 *N.J.Super.* at 44, 568 *A.*2d 1213.

As trustee under the note issue (as well as in the other capacities) First Fidelity presumably received significant fees for its responsibilities, which in part included protecting the rights of note holders. In that capacity, for which it was paid, First Fidelity now says it had no obligation to notify any note holders in any fashion other than by the method of publication as set forth in the Commission's resolution. On the other hand, First Fidelity argues that in its capacity as a bank, its investment department, which also receives fees for its services, including protection of customers, apparently undertook to give special notice to its own customers past and potential, with no obligation to do so. See *Rudbart, supra,* 238 *N.J.Super.* at 51

n. 4, 568 *A*.2d 1213. Thus, First Fidelity argues that it can demand the benefits of both worlds, but without any additional obligations, particularly toward those who did not purchase the notes through it.

Although First Fidelity has a trust department, an investment department, and other departments or functions, it was First Fidelity that was appointed trustee, not one of its departments. It had fiduciary responsibilities under the terms of the resolutions, and those were not negated by federal law or a lesser standard of trusteeship.[8] The bank is charged, or should be charged here, with knowledge of all of the actions of all its departments and subdivisions, whether or not one department had actual contact with another. The fact is that First Fidelity elected to notify selectively its own customers. It acted in a manner that exhibited at best a lack of fair dealing and at worst, bad faith. It should not be allowed to assume duties with one hand and to reject them with the other. This case is a more compelling one to apply the fairness doctrine because First Fidelity knew about the situation with respect to note holders, but acted for only its own customers. It acted in multiple capacities and should not be allowed to claim a judicially sanctioned split personality and hide behind an artificially created "Chinese wall" that it alternatively erects or dissolves based on whether it claims a trust duty, a stakeholder's duty, or some other function. It was First Fidelity, the entity, that assumed multiple positions and was appointed with the responsibility of indenture trustee, however defined. The existence of separate divisions for business purposes does not allow it to act in a disparate manner when it knows the names and addresses of registered note holders who are both customers and non-

---

[8]This is aside from obligations imposed by law. 12 *C.F.R.* § 9.10 and *N.J.S.A.* 17:9A–35(D) appear to assume that unclaimed fiduciary funds are not to be held uninvested longer than reasonably necessary for proper account management. See *supra* at 374 n. 6, 605 *A*.2d at 696 n. 6.

customers. *See Buonviaggio v. Hillsborough Township Committee*, 122 *N.J.* 5, 15, 583 *A.*2d 739 (1991).

The majority opinion chooses to ignore the fact that in the related case of *Ellovich v. First Fidelity Bank, N.A., N.J.,* No. 87–650 (D.N.J.1988), it was established that prior to issuance of the offering statement, First Fidelity's counsel suggested that notice of early redemption be given by mail rather than publication, based on his understanding that that was the usual form of notice to holders of registered securities. *Rudbart, supra,* 238 *N.J.Super.* at 53 n. 5, 568 *A.*2d 1213. Moreover, the "Stipulation of Facts" submitted in connection with the summary judgment motions stated: "Prior to the publication of the notices, Julie Saloveitch Miller, Administrator of the bond offering at First Fidelity, discussed the notice to be given with Gerald Volpe, Comptroller of the Commission." The Commission insisted on the publication notice. *Ibid.* Nonetheless, nothing requires that the published notice had to be the *exclusive* method of notice. There is also a reference in the argument before the Law Division on September 2, 1988, and in submitted deposition testimony, to a discussion between the representatives of the Bank and the Commission about the type of notice to be given just before the time of notice by publication. To compound the problem, First Fidelity refused to deposit in an interest-bearing account the sums due the note holders who had not sought timely redemption even after the Commission had requested that action after the redemption date.[9]

That a public entity may have participated in what resulted in unfair notice should not be a basis to excuse such action merely because rate payers may be affected. When dealing with the public, "government must 'turn square corners' rather than exploit litigational or bargaining advantages that might otherwise be available to private citizens." *W.V. Pangborne & Co.*

---

[9] The bank apparently settled with some "good customers."

*v. New Jersey Dep't of Transp.*, 116 *N.J.* 543, 561, 562 *A.2d* 222 (1989). The government must act fairly and "with compunction and integrity." *Id.* at 562, 562 *A.2d* 222 (quoting *F.M.C. Stores Co. v. Borough of Morris Plains*, 100 *N.J.* 418, 427, 495 *A.2d* 1313 (1985)).

The Appellate Division decision is essentially limited to the *notice* provisions under the unique circumstances of this case. It does not affect the financial terms of the project notes in any way. Moreover, with that limitation highlighted, it is clear that the Appellate Division holding regarding the lack of fairness of limiting the notice provisions of the notes to publication in unspecified (in the prospectus or note) newspapers circulating in New York City and Newark [10] and has nothing to do with:

(1) the financial terms of the notes;

(2) the sale and issuance of the notes;

(3) the risk of *investment* [That hardly includes the risk that the issuer would forget about the registered owner];

(4) the price or pricing of the security;

(5) the operation of the issuer or the underwriters; or

(6) damage or loss to the issuer or the bank [the cost of any written notice to individual registered bond holders would be *de minimis* and could even be deducted from interest after the redemption date].

In actuality there is no real burden placed on the securities industry by a requirement that fair notice be given to note holders in the issuance of registered securities. What occurred here was an atypical situation. The limited record before us indicates that with respect to all other issues, and particularly future tax exempt issues, individual notice to the registered security holders is the general practice, encouraged and in effect required by the SEC.

Simply stated, fair dealing should be required. *Cf. New Brunswick Savings Bank v. Markouski*, 123 *N.J.* 402, 423–426,

---

[10] I doubt whether any court would have difficulty with the adequacy or fairness issue here if notice to registered note holders were to be solely in newspapers published and circulating, for instance, in Nome, Alaska and/or a designated city in any non-contiguous sister state of the United States.

587 *A.*2d 1265 (1991) (actual notice of an execution sale must be provided to judgment creditors whose names and addresses are reasonably ascertainable). *Onderdonk v. Presbyterian Homes of N.J.,* 85 *N.J.* 171, 182, 425 *A.*2d 1057 (1981) (implied conditions include fairness and justice); *Bak–a–Lum Corporation of America v. Alcoa Building Products, Inc.,* 69 *N.J.* 123, 129–130, 351 *A.*2d 349 (1976) (implied covenant of good faith and fair dealing in every contract).

Although I differ with some of the reasoning in the Court's opinion, I concur in the result reached in Part IV. However, my preference would be to affirm substantially for the reasons expressed by the Appellate Division as reported at 238 *N.J.Super.* 41, 568 *A.*2d 1213 (App.Div.1990).

GAULKIN, P.J.A.D. (temporarily assigned), concurring in part and dissenting in part.

Part III of the *per curiam* opinion concludes that, although the project notes are contracts of adhesion, "plaintiffs are bound by the provision for notice by publication because of the unique policy considerations attendant on securities offerings." *Ante* at 361, 605 *A.*2d at 689. But Part IV then gives plaintiffs what the notice provision denies them: interest after the published redemption date. I join in Part III but dissent from the patently contradictory holding of Part IV.

The law and policy considerations recited in Part III persuasively support the conclusion that "the asserted unfairness of the notice provision is not sufficient to justify judicial intrusion." *Ante* at 359, 605 *A.*2d at 688. However, in Part IV, the Court holds that such an intrusion is warranted because of the "overwhelming inequity" in Fidelity's "perhaps benefiting from the use of the retained money." *Ante* at 361, 605 *A.*2d at 690. That inconsistency is neither overcome nor explained away by the Court's application—without any invitation or argument of the parties—of labels of constructive trust and "fair dealing."

The Court acknowledges that the "principle [of fair dealing] will not alter the terms of a written agreement." *Ante* at 366, 605 *A*.2d at 692. The same must be said of constructive trust principles: a party to a contract cannot be said to be unjustly enriched by a benefit granted by an otherwise enforceable term of the agreement. The Court says, however, that "allowing plaintiffs some portion of the return on their withheld funds does not in any sense alter the written terms of the agreement between these parties." *Ante* at 366, 605 *A*.2d at 692. Saying that does not make it so. The project notes provide that they "shall cease to bear interest" from the published redemption date, yet the Court awards plaintiffs an "equitable share of any income earned on [their] funds" after the redemption date. *Ante* at 366, 605 *A*.2d at 692. The Court has altered or negated the contractual term.

The Court implicitly recognizes that constructive trust or fair dealing principles could not overcome the contractual terms solely on a showing that the stakeholder, Fidelity, earned money on the unredeemed proceeds. Rather, the Court bases its finding of unjust enrichment on the fact that "Fidelity was aware of the noteholders' lack of notice but acted for only its own customers." *Ante* at 366, 605 *A*.2d at 692. Why that should trigger the cause of action is unexplained. The Court does not suggest that Fidelity's investment department used inside information or otherwise acted improperly in notifying its customers of the redemption; nor does the Court hold that Fidelity's trust department had any fiduciary duties beyond those spelled out in the documents. *Ante* at 366, 605 *A*.2d at 692. If each department acted appropriately, how is it that their combined conduct was inequitable? Would the unfairness perceived by the Court evaporate if Fidelity had not informed even its own customers of the early redemption?

Simply stated, the Court's award of interest after the published redemption date cannot be squared with the purported enforcement of the contract. Melding the two holdings is not only logically unsustainable, it creates a new uncertainty about

the rights and liabilities of parties to securities transactions. Indeed, the Court's instructions for the remand proceedings, *ante* at 367–368, 605 *A*.2d at 692–693, indicate how unclear the obligations of Fidelity and the Commission remain even now. As Part III of the *per curiam* opinion convincingly demonstrates, avoidance of such uncertainty is one of the "unique policy considerations" justifying enforcement of the contract as written. Those policy considerations should at least restrain the Court from announcing rights and duties the litigants have never argued.

I would reverse the judgment entered in the Appellate Division and reinstate the Law Division judgment.

Judge KEEFE joins in this opinion.

CLIFFORD, J., dissenting.

On the only issue raised in the petition for certification and addressed at oral argument, the plurality opinion declares that the Appellate Division erred in "holding that the subject securities constitute a contract of adhesion." *Ante* at 348, 605 *A*.2d at 683. The opinion then muddies the waters by acknowledging, as surely it must, that "[t]he project notes involved here unquestionably fit our definition of contracts of adhesion," *ante* at 354, 605 *A*.2d at 686, a concession repeated *ante* at 360, 605 *A*.2d at 689. And so the plurality creates a little paradox, the jurisprudential equivalent of saying that even though something walks like a duck and quacks like a duck, it must be a donkey.

Aside from the distracting confusion generated by the plurality's foregoing flip-flop, I agree with so much of the opinion as holds that the notice provision is not unfair to the holders of the notes. Notice of redemption effected by publication was within the reasonable expectations of the noteholders, because the notice provision was legibly printed in the offering statement and investors are charged by *N.J.S.A.* 12A:8–202(1) with notice of terms set forth in the offering statement. The notice

provision was not unconscionable or against public policy or unduly oppressive.

Beyond all of that, I join in Judge Gaulkin's dissent from Part IV of the plurality opinion.

To recapitulate: I agree with Judge Petrella that the project notes are contracts of adhesion. I agree with the plurality that the notice provision is not unfair. And I agree with Judge Gaulkin's dissent from Part IV.

I would reverse the judgment of the Appellate Division and reinstate the Law Division's judgment in favor of defendants.

*For reversal; remandment*—Chief Justice WILENTZ, Justices HANDLER and O'HERN, and Judge PETRELLA—4.

*For reversal; reinstatement*—Justice CLIFFORD, and Judges GAULKIN and KEEFE—3.

PETRELLA, Judge, concurring in remandment; dissenting in part—1.