**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0640-22

NVL, INC., A DELAWARE
CORPORATION and
HOOMAN NISSANI,
an individual,

      Plaintiffs-Appellants,

v.

VOLVO CAR USA LLC, A
DELAWARE LIMITED
LIABILITY COMPANY,

      Defendant-Respondent.

_____

Argued December 5, 2023 – Decided February 15, 2024

Before Judges Whipple, Mayer and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-4341-18.

Christopher J. Sullivan argued the cause for appellants (Nutter McClennen and Fish LLP, attorneys; Christopher J. Sullivan, on the briefs).

Patrick Thomas Hagerty argued the cause for respondent (Hardin, Kundla, McKeon and Poletto,

attorneys; Patrick Thomas Hagerty, on the brief; Paul Daly, on the brief).

PER CURIAM

Plaintiffs NVL, Inc. and Hooman Nissani (Nissani) appeal from an October 17, 2022 order granting summary judgment to defendant Volvo Car U.S. LLC (Volvo), and dismissing their complaint with prejudice. We affirm.

I.

We recite the facts from the record. For nearly twenty years, Nissani operated several car dealerships in Long Beach and Los Angeles California. Among his dealerships were Chrysler, Dodge, RAM, Hyundai, Nissan, Toyota, Acura, Scion, General Motors, Chevrolet and Jeep. Additionally, Nissani received many awards for dealership design and successful dealership management. In addition to owning and operating several successful car dealerships, Nissani was a real estate developer and owned a number of real estate projects in the Los Angeles area. Volvo is a world-renowned automotive manufacturer, in operation for over fifty years.

On November 5, 2014, Nissani and Volvo executed an eight-page Letter of Intent (2014 LOI) to construct a new Volvo dealership in Long Beach, California. In pertinent part the 2014 LOI provided:

You have requested that Volvo . . . enter into a Volvo Retailer Agreement . . . that is exclusive to Volvo dealership operations.

. . . .

[Volvo]'s offer to enter into a Volvo Retailer Agreement is subject to the satisfaction, in [Volvo]'s sole and reasonable discretion, or waiver of the terms and conditions set forth in this LOI, including, without limitation, the timely performance to [Volvo]'s satisfaction of your obligations set forth below:

. . . .

5. Facility Commitment, Construction. On or before May 1, 2015, you must complete construction of the New Facility at the Long Beach site, and secure from the appropriate municipal authority a certificate of occupancy. By this date, you must also occupy the New Facility and open the Dealership for business operations. Construction of the New Facility shall be in strict accordance with all of the architectural details, colors, furniture, finishes, fixtures, materials, signage and key design elements of the Design Program, as will be specified in . . . [d]rawings . . . that will be prepared by a [Volvo] representative at your expense.

. . . .

19. Termination of LOI. If, in the judgment of [Volvo], exercised in its sole and reasonable discretion (a) you fail to satisfy . . . in a timely and lawful manner any of [your] obligations set forth in this LOI; (b) you . . . fail to meet [Volvo]'s due diligence criteria; (c) any of the conditions set forth in this LOI are not timely satisfied (or waived); or (d) you . . . fail to satisfy any and all other terms and conditions required by [Volvo] in its

3

reasonable discretion, [Volvo] shall have the right to terminate this LOI, upon delivery of written notice to such effect to you. In such event, [Volvo] shall be under no obligation to enter into a Retailer Agreement with [you], and neither [Volvo] nor any [Volvo] Entity . . . shall be liable to you . . . for any damages suffered by reason of reliance on this LOI.

. . . .

21. Miscellaneous.

. . . .

d. <u>Covenant not to Sue.</u> You hereby voluntarily assume the entire risk of the undertakings contemplated herein. You, by your execution and delivery of this LOI, and intending to be legally bound hereby, further agree and covenant not to sue any [Volvo e]ntity with respect to any or all damages you may suffer by reason of taking any action in reliance upon this LOI, in the event [Volvo] terminates this LOI, and, in so doing, fails or refuses to approve [your] . . . appointment as a [Volvo] Retailer.

. . . .

g. <u>Due Diligence, Construction</u>. You represent and warrant to [Volvo] that you have executed this LOI voluntarily and of you own free will. You further represent that, prior to the execution of this LOI, you have had adequate time and information to permit you to consult with your accountants, attorneys, financial advisors

4

> or other consultants of your choice. The parties agree that the words used in this LOI shall be deemed to be words chosen by [Volvo] and you to express mutual intent. No rule of strict construction against either [Volvo] or you shall apply to any term or provision of this LOI.

Over the next two years, there was little progress in Nissani's construction of the new Volvo dealership. Therefore, in the Spring of 2016 the parties began discussing a new LOI (2016 LOI). On August 24, 2016, Volvo provided Nissani with the initial version of the 2016 LOI. In the initial version of that LOI, the "dollar amounts and construction timelines . . . were negotiable."

On September 1, 2016, Nissani sent Volvo an email stating he provided the 2016 LOI to his attorney for review. Volvo understood Nissani was reviewing the 2016 LOI with his counsel and the review "took a lot of time." However, Nissani testified he "was not sure or did[ not] believe he shared the LOI with his attorney" because Volvo wanted to "keep[] everything completely confidential and not to shar[e] it with anybody," including his attorney. Despite not being "confident that [he] understood all the terms and conditions of the" 2016 LOI, Nissani signed the agreement.

On October 25, 2016, the parties executed the thirteen-page 2016 LOI. In relevant part, the 2016 LOI provided:

This LOI replaces the [2014 LOI] . . . .  No terms from the [2014 LOI] are relevant to the terms and conditions set forth in this LOI.

. . . .

2.1  The appointment of [you] as an authorized Volvo retailer is conditioned on, and subject to, you completing and satisfying (as determined by us, in our sole discretion) the Conditions and deadlines set out on Schedules 1, 2 and 3, otherwise complying with and fulfilling your obligations under this LOI.

. . . .

2.8    . . .

. . . .

. . . .  You agree that the approved Volvo facility shall be completed and ready for operation by August 15, 2017.

. . . .

[Volvo] Support & Payment Schedule:  We will provide Facility Support Funds in the amount of $2,000,000. These support funds are solely to assist in making approved facility investments at the approved location. These funds will be provided to you in three (3) lump sum installments . . . .

. . . .

2.13   You agree to be ready to commence Volvo operations by August 15, 2017.

. . . .

6

7. Other rights of termination

     . . . .

7.2 We may also terminate this LOI by giving you written notice if, in our judgment, exercised in our sole and reasonable discretion:

     . . . .

(b) any of the Conditions are not fulfilled by the deadlines set out on Schedules 1 or 2; or

(c) you breach any of the other terms of the LOI or otherwise fail to perform your obligations under this LOI.

7.3 If this LOI is terminated for any reason as provided herein, we will not be obligated to enter a Retailer Agreement. Without limiting the foregoing you acknowledge and agree that . . . we . . . will [not] be liable to you or any other party for any damages, losses, costs or expenses suffered or incurred by you or any other party arising out of, relating to or in connection with this LOI (whether because of reliance on this LOI or otherwise) under any circumstances.

Included within the 2016 LOI were Schedules 1, 2, and 3. Schedules 1 and 2 provided details regarding tasks Nissani was to complete, along with dates for completion. Schedule 3 provided:

4. Covenant not to sue

4.1 You voluntarily assume the entire risk of the undertakings contemplated in this LOI.

7

4.2  By signing the LOI you are entering into binding legal obligations.  You will not sue any [Volvo] Entity for any damages you may suffer because of taking any action in reliance upon this LOI, if we terminate this LOI or we fail or refuse to approve [your] appointment as a Volvo retailer.

. . . .

6.  Due diligence

6.1  You have entered into this LOI voluntarily.  You agree that you have had adequate time and information to allow you to consult with your accountants, attorneys, financial advisors or other consultants of your choice.

. . . .

9.  Other

9.1  This LOI may only be amended in writing and if signed by you and [Volvo's] Regional Vice President and Vice President of Network Development or another authorized officer of Volvo . . . .

. . . .

9.7  Time is of the essence for all matters in this LOI.

In late 2016 and throughout 2017, Volvo discussed the acquisition of a Las Vegas based Volvo dealership with another entity.

Nissani failed to meet the first deadline of March 15, 2017 under the 2016 LOI.  On July 31, 2017, Nissani emailed Volvo stating, "we are now ready to

set up the time line for completion of our dealership." He proposed to submit plans to the city for approval on July 1, 2017; start construction December 2017; and have a "grand opening on May 31, 2018." On August 7, 2017, a Volvo representative responded to the email, requesting follow up information, including updates and status reports on the city's review process and a banking letter showing the "potential floor plan is in process with a bank."

The same Volvo representative thought it was "possible" but "unlikely" that anything was sent to Nissani, in writing, extending the 2016 LOI to December 1, 2017. However, the Volvo representative recalled telling a third-party vendor that December 2017 was a more realistic date for Nissani's commencement of construction.

On September 1, 2017, Volvo wrote a letter to Nissani stating:

> Please be advised that Volvo . . . is terminating the . . .
> [2016 LOI]. [Volvo] is terminating the [2016] LOI
> pursuant to [s]ection 7.2 b of the [2016] LOI.
> Unfortunately, you have continuously failed to meet the
> [c]onditions of the [2016] LOI by the deadlines set forth
> in Schedules 1 and 2 in the [2016] LOI often with an
> unacceptable explanation to [Volvo]. Accordingly, the
> [2016] LOI is terminated as set forth above effective
> immediately.

On the same day, Volvo sought approval to "invest up to [two-million dollars] to acquire [the] Las Vegas" dealership. The Volvo representative testified the

decisions to terminate the 2016 LOI and to move forward with the Las Vegas transaction were unrelated. While Volvo considered the Las Vegas project "important" and would have figured out financing of that project, Volvo's representative acknowledged termination of the 2016 LOI "could have helped from a budget standpoint." However, the Volvo representative testified that Volvo could have funded Nissani out of its 2018 budget.

Nissani initially brought suit in the United States District Court for the Central District of California. That court found the "forum selection clause [in the 2016 LOI] impose[d] a sovereignty limitation, thus requiring adjudication of this action by a New Jersey state court." NVL, Inc. v. Volvo Car USA, LLC, No. CV 18-1956, 2018 WL 6137178 at 14 (C.D. Cal. Apr. 26, 2018).

On June 12, 2018, Nissani filed this action. In lieu of filing an answer, Volvo filed a motion to dismiss for failure to state a claim upon which relief can be granted. The trial court denied Volvo's motion to dismiss. After discovery, Volvo filed for summary judgment.

II.

In a written opinion, the motion judge granted Volvo summary judgment. He determined Nissani could not maintain a cause of action for damages because the "not to sue" provision of the 2016 LOI was enforceable. The judge found

10

the clause was neither procedurally nor substantively unconscionable. He determined Volvo was "a major automobile manufacturer." However, he also found that Nissani: was a "sophisticated businessman [with] significant experience negotiating with automobile manufacturers"; "negotiated directly with [Volvo's] executives"; and "had an attorney review the 2016 LOI before it was executed." Therefore, the judge found the "not to sue" clause was not procedurally unconscionable.

In addition, the judge determined that the "not to sue" clause was not substantively unconscionable. The judge found: the clause "d[id] not contain substantive terms that are so one-sided so as to shock the [c]ourt's conscience[; l]iability waivers are commonly included in contracts between sophisticated parties"; Nissani "[wa]s not susceptible to an unfair transaction"; the parties "engaged in negotiation and mutually assented to all terms included in the" 2016 LOI; Nissani agreed to the same terms in the 2014 LOI and the 2016 LOI; and the clause was "conspicuously located" and labeled in the 2016 LOI.

Moreover, the judge determined that the New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -227, did not apply to the parties' transaction, because it did not involve "merchandise . . . offered to the public at large" or "a consumer

A-0640-22

transaction." Instead, the "relationship indicate[d] that [Nissani] was regarded as a . . . business partner and proprietor."

Also, the judge found that Nissani could not maintain a cause of action for unjust enrichment. The judge determined there was "no . . . evidence of unjust enrichment in the record." He found Volvo "derived no unjust benefit" from Nissani's "costs and expenses for the prospective dealership which did not come to fruition . . . ." Moreover, Volvo's subsequent "reallocation of $2[,000,000] initially earmarked for [Nissani]'s project c[ould ]not be considered unjust enrichment . . . ."

Further, the judge determined Nissani could not recover "lost profits" because the proffered expert opinion was based on "conjecture." The judge found the "performance data [used was from] several of [Nissani]'s dealerships during a period ending in 2014," and "the proposed dealership would have operated from approximately 2018 onwards, under very different economic conditions which would have led to a vastly different dealership performance." Also, the judge found the expert's "[r]eport state[d] an exorbitant year-over-year growth rate of 29.6%, a number which [wa]s far from [Volvo's] sales figures in its experience . . . ."

III.

12

On appeal, Nissani contends: (A) "the covenant not to sue in the 2016 LOI is unenforceable as a matter of law" or "the issue of enforceability raises material facts for trial"; (B) there were genuine issues of material fact regarding: (i) Volvo's "reliance [on] the 2014 LOI . . . for the termination"; (ii) the 2016 LOI was extended; and (iii) the 2016 LOI was terminated "in bad faith and with wrongful intent"; (C) the "proposed dealership constitutes 'merchandise' under the [CFA]"; (D) the judge "erred in dismissing [Nissani's claim] for unjust enrichment"; and (E) the judge "erred in [his] ruling about lost profits."

We review a ruling on a motion for summary judgment de novo, applying the same standard governing the trial court. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co., 224 N.J. 189, 199 (2016). Thus, we consider, as the motion judge did, "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540 (1995). If there is no genuine issue of material fact, we must then "decide whether the trial court correctly interpreted the law." DepoLink Court Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (citation omitted). We review issues of law de novo and accord no deference to the trial

13

judge's legal conclusions. <u>Nicholas v. Mynster</u>, 213 N.J. 463, 478 (2013). "The factual findings of a trial court are reviewed with substantial deference on appeal, and are not overturned if they are supported by 'adequate, substantial and credible evidence.'" <u>Manahawkin Convalescent v. O'Neill</u>, 217 N.J. 99, 115 (2014) (quoting <u>Pheasant Bridge Corp. v. Twp. of Warren</u>, 169 N.J. 282, 293 (2001)).

This standard compels the grant of summary judgment:

> if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.
>
> [<u>R.</u> 4:46-2(c).]

"Under that standard, once the moving party presents sufficient evidence in support of the motion, the opposing party must 'demonstrate by competent evidential material that a genuine issue of fact exists[.]'" <u>Globe Motor Co. v. Igdalev</u>, 225 N.J. 469, 479-80 (2016) (citing <u>Robbins v. Jersey City</u>, 23 N.J. 229, 241 (1957) (alterations in the original)). "[C]onclusory and self-serving

assertions by one of the parties are insufficient to overcome the motion." Puder v. Buechel, 183 N.J. 428, 440-41 (2005) (citations omitted). More is required than a "mere denial." Mangual v. Berezinsky, 428 N.J. Super. 299, 313 (App. Div. 2012).

## A.

Nissani contends the judge made two errors in his analysis of the covenant not to sue. First, he argues the judge applied the wrong law, relying on the outdated standard set forth in Tannock v. N.J. Bell Tel. Co., 212 N.J. Super. 506 (Law Div. 1986), aff'd in part, rev'd in part, 223 N.J. Super. 1 (App. Div. 1988), rather than the later and controlling standard set forth in Rudbart v. N.J. Dist. Water Supply Comm., 127 N.J. 344 (1992) regarding contracts of adhesion. Second, he argues the judge "improperly resolved disputed material factual issues against Nissani," "in the face of clear evidence . . . that contradicted those findings."

The freedom to contract is a foundational pillar of New Jersey law. Marcinczyk v. State of N.J. Police Training Comm'n, 203 N.J. 586, 592 (2010). In the absence of fraud, duress, illegality or mistake, a contract is fully binding, and "the parties are 'conclusively presumed' to understand and assent to its legal effect." Id. at 593 (quoting Rudbart, 127 N.J. at 353). Absent these findings, a

court will not interfere with parties' freedom to enter into binding agreements. See Gross v. Lasko, 338 N.J. Super. 476, 485-86 (App. Div. 2001).

"In a commercial setting, '[t]he judiciary will not undertake the writing of a different or better contract between the parties.'" Chemical Bank of N.J. Nat. Ass'n v. Bailey, 296 N.J. Super. 515, 527 (App. Div. 1997) (quoting Swisscraft Novelty Co. v. Alad Realty Corp., 113 N.J. Super. 416, 421 (App. Div. 1971)).

A contract of adhesion is "presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the adhering party to negotiate except perhaps on a few particulars." Moore v. Woman to Woman Obstetrics & Gynecology, LLC., 416 N.J. Super. 30, 38 (App. Div. 2010) (quoting Rudbart, 127 N.J. at 353). Despite requiring one party to accept or reject the agreement, as is, a contract of adhesion is not per se unenforceable. Stelluti v. Casapenn Enters., LLC, 203 N.J. 286, 301 (2010). "The determination that a contract is one of adhesion . . . 'is the beginning, not the end, of the inquiry' into whether a contract, or any specific term therein, should be deemed unenforceable based on policy considerations." Muhammed v. Cnty. Bank of Rehoboth Beach, Delaware, 189 N.J. 1, 15 (2006) (quoting Rudbart, 127 N.J. at 354).

"[A] court may decline to enforce [an adhesion contract] if it is found to be unconscionable." Vitale v. Schering-Plough Corp., 231 N.J. 234, 246 (2017) (citation omitted). "A sharpened inquiry concerning unconscionability is necessary when a contract of adhesion is involved." Muhammed, 189 N.J. at 15.

"The seminal case of Rudbart . . . set out factors for courts to consider when determining whether a specific term in a contract of adhesion is unconscionable and unenforceable." Ibid. The "factors focus on procedural and substantive aspects of the contract 'to determine whether the contract is so oppressive, or inconsistent with the vindication of public policy, that it would be unconscionable to permit its enforcement.'" Rodriguez v. Raymours Furniture Co., Inc., 225 N.J. 343, 367 (2016) (citation omitted). The factors include: "[(1)] the subject matter of the contract, [(2)] the parties' relative bargaining positions, [(3)] the degree of economic compulsion motivating the 'adhering' party, and [(4)] the public interests affected by the contract." Rudbart, 127 N.J. at 356.

The first three factors speak to procedural unconscionability, and the last factor speaks to substantive unconscionability. Rodriguez, 225 N.J. at 367. "When making the determination that a contract of adhesion is unconscionable

and unenforceable, we consider, using a sliding scale analysis, the way in which the contract was formed and, further, whether enforcement of the contract implicates matters of public interest." Stelluti, 203 N.J. at 301.

Nissani argues the judge "applied the wrong law, relying on the outdated standard set forth in Tannock." Volvo counters that it "is inconsequential[] [because] an analysis under either [Tannock or Rudbart] would undoubt[edly] result in the same conclusion." Without commenting on the status of Tannock, we agree that the New Jersey Supreme Court has set a broader, "multi-factor analysis generally conform[ing] to the case-by-case approach widely used for evaluating claims of unconscionability." Muhammed, 189 N.J. at 16. Therefore, we conduct our de novo review under the Rudbart standard.

There is no dispute that the 2016 LOI was a contract of adhesion. Nissani contends "there can be no question that [the] contract at issue in this case was an adhesion contract with respect to the covenant not to sue." Volvo, while defining what constitutes a contract of adhesion, immediately embarks on an unconscionability analysis.

The question then is whether in the 2016 LOI covenant not to sue clause is unconscionable and unenforceable. See Muhammed, 189 N.J. at 15. The clause provides:

4. <u>Covenant not to sue</u>

4.1 You voluntarily assume the entire risk of the undertakings contemplated in this LOI.

4.2 By signing this LOI you are entering into binding legal obligations. You will not sue any [Volvo] Entity for any damages you may suffer because of taking any action in reliance upon this LOI, if we terminate this LOI or we fail or refuse to approve [your] appointment as a Volvo retailer.

Applying the first three factors, we are not convinced the "[c]ovenant not to sue" is procedurally unconscionable. The 2016 LOI, much like its predecessor, the 2014 LOI, involved a commercial agreement between two experienced parties. There is no factual dispute that Volvo was "a major automobile manufacturer." Nor is there any dispute that Nissani had nearly twenty years of experience operating car dealerships and "won many awards for dealership design and success of dealership operations." On this record, there is no evidence "Volvo had grossly disproportionate bargaining power."

Moreover, Nissani argues "[a]t the time Volvo presented the 2016 LOI . . . he had already invested significant time and hundreds of thousands of dollars . . . . Thus, [he] faced significant economic compulsion to enter into the 2016 LOI . . . ." However, this argument ignores that the 2014 LOI, under which

Nissani "invested [the] significant time and hundreds of thousands of dollars," contained a "[c]ovenant not to sue" clause similar to the 2016 LOI.

In addition, Nissani argues the motion judge's finding that he "had an attorney review the 2016 LOI before it was executed" was improper because "the lack of involvement of Nissani counsel" was a "disputed material issue[] of fact." Our review of the record reveals: (1) the 2016 LOI stated Nissani "entered into th[e] LOI voluntarily" and he "agree[d] that [he] . . . had adequate time and information to allow [him] to consult with [his] . . . attorneys . . . or other consultants of [his] choice"; (2) Nissani emailed Volvo stating "the letter of intent was with [his] lawyer," although he testified that he "was not sure or did[ not] believe he" shared the LOI with his attorney; and (3) Volvo understood that Nissani "sat on [the 2016 LOI] . . . and he was reviewing [it] with his counsel," and "took a lot of time to look at [it] with his counsel."

Here, Volvo demonstrated Nissani had counsel for the 2016 LOI, which was supported by Nissani's own email and his acknowledgment that he had adequate time to consult with attorneys. Even giving Nissani every inference, his equivocal testimony that he "was not sure or did[ not] believe he" shared the LOI with his attorney is a "mere denial" and insufficient to create a material fact in dispute.

A-0640-22

Moreover, we recognize the importance of attorneys in commercial business transactions such as this one. "[T]he opportunity to consult counsel allows: '[a]ttorneys (to) offer advice on a limitless range of matters.'" Bassford v. Trico Mortgage Co., 273 N.J. Super. 379, 382 (Law. Div. 1993) (quoting Trenta v. Gay, 191 N.J. Super. 617, 621 (Ch. Div. 1983)). "Clients rely on them not only for legal advice but also for emotional support, financial guidance and common sense." Ibid. However,

> [i]t is the general rule that where a party affixes his signature to a written instrument . . . a conclusive presumption arises that he read, understood and assented to its terms and he will not be heard to complain that he did not comprehend the effect of his act in signing.
>
> [Peter W. Kero, Inc. v. Terminal Const. Corp., 6 N.J. 361, 368 (1951).]

Therefore, despite his alleged uncertainty regarding his use of counsel, Nissani signed the 2016 LOI, raising a "conclusive presumption . . . that he . . . understood and assented to its terms . . . ." Ibid.

Furthermore, under the fourth factor, we find no public interest that would preclude sophisticated and experienced commercial parties from agreeing to limit the risk of loss in their contract. "It is fundamental that parties to a contract may allocate risk of loss by agreeing to limit their liability . . . ." Bailey, 296

21

N.J. Super. 526-27. Clauses in private contracts that limit liability are generally sustained. Mayfair Fabrics v. Henley, 48 N.J. 483, 487 (1967). "Exculpatory clauses are more commonly upheld in the commercial context." Bailey, 296 N.J. Super. at 527; see also Hy-Grade Oil Co. v. N.J. Bank, 138 N.J. Super. 112, 116 (App. Div. 1975) ("[S]uch clauses [a]re enforced, chiefly in the commercial setting . . . .").

Therefore, while the 2016 LOI was a contract of adhesion, it was not unconscionable and, therefore, we are convinced it was enforceable. Because we review orders on appeal, rather than a trial judge's legal reasons, we affirm the order granting summary judgment but for reasons other than those expressed by the trial judge. See Isko v. Planning Bd. of Livingston, 51 N.J. 162, 175 (1968), abrogated on other grounds by Com. Realty Res. Corp. v. First Atl. Props. Co., 122 N.J. 546, 565 (1991); Hayes v. Delamotte, 231 N.J. 373, 387 (2018).

## B.

Nissani argues the motion judge erred because there were "issues of material [fact] relating to the validity of the termination itself [that] preclude summary judgment." Nissani avers: (1) the motion judge "recognized that '[i]t

[wa]s undisputed that the 2016 LOI superseded and replace[d] entirely the 2014 LOI,' [but then] erroneously ignored (and effectively endorsed) Volvo's overwhelming reliance on the 2014 LOI in terminating the [2016] LOI"; (2) "[a]ll of the [t]ime [d]eadlines in Schedule 1 and 2 to the 2016 LOI were [e]xtended by the [a]ctions and [c]onduct of the [p]arties"; and (3) "Volvo [t]erminated the 2016 LOI [i]n [b]ad [f]aith and [w]ith [w]rongful [i]ntent." We disagree.

i.

In reviewing the motion judge's written decision, nothing in the judge's factual findings or legal conclusions indicated that Nissani's actions under the 2014 LOI supported Volvo's termination of the 2016 LOI.

Instead, the motion judge found: (1) the 2016 LOI "provided for a tight schedule . . . [because Nissani had] failed to meet ['several construction deadlines'] under the 2014 LOI"; (2) "[t]he various construction deadlines included in the 2016 LOI were extended multiple times in an attempt to allow [Nissani] to comply"; and (3) Volvo "elected to terminate the 2016 LOI by letter dated September 1, 2017, citing a pattern of failed deadlines." The September 1, 2017 letter confines the termination to Nissani's "continuous[] fail[ing] to

meet the [c]onditions of the [2016] LOI by the deadlines set forth in Schedules 1 and 2 in the [2016] LOI often with an unacceptable explanation to [Volvo]."

ii.

Nissani argues the "evidence in the record . . . show[s] that (i) only cosmetic changes . . . remained to be done as of [the date of termination], and (ii) Nissani had submitted the plans to the City of Long Beach for preliminary approval, which he could not have done if major revisions remained to be done." Therefore, Nissani claims "[w]hether time deadlines were extended and the status of the plans are material issues of fact." We find these arguments unavailing.

The motion judge found "[t]he various construction deadlines included in the 2016 LOI were extended multiple times in an attempt to allow [Nissani] to comply." Nonetheless, "[u]ltimately, [Volvo] elected to terminate the 2016 LOI by letter dated September 1, 2017, citing a pattern of failed deadlines."

The 2016 LOI provided "[a]ny term or provision of [the 2016 LOI] may be waived in writing . . . [but n]o failure to exercise and no delay in exercising, any right, power or privilege w[ould] operate as a waiver thereof . . . ." While Volvo continued to work with Nissani, despite missed deadlines, there is no evidence in the record that Volvo agreed to extend deadlines or waived its right

24

to terminate the 2016 LOI for the reasons provided therein. In the September 1, 2017 letter, Volvo terminated the 2016 LOI pursuant to section 7.2(b) which allowed for termination if "any of the [c]onditions are not fulfilled by the deadlines set out on Schedules 1 or 2."

There is no disputed material fact that there were conditions unfulfilled. By way of example, in Nissani's July 31, 2017 email, he stated a plan to start construction in December 2017, when the 2016 LOI required the first "critical construction milestone" to have already been "achieved by March 15, 2017," and he planned to have a "grand opening by May 31, 2018" when the 2016 LOI required he be "ready to commence Volvo operations by August 15, 2017."

iii.

Nissani argues there are "questions of material fact . . . as to whether Volvo terminated the 2016 LOI in bad faith and with wrongful intent." He avers "Volvo's conduct in terminating the 2016 LOI is almost a textbook example of a violation of the implied covenant of good faith and fair dealing . . . contained in every contract and raises an issue of fact," citing Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420-21 (1997).

"[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing." Sons of Thunder, 148 N.J. at 420-21. The covenant

A-0640-22

provides that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Ibid. (citations omitted).

"Although the implied covenant of good faith and fair dealing cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term." Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001). Therefore, "in New Jersey 'a party to a contract may breach the implied covenant of good faith and fair dealing in performing its obligations even when it exercises an express and unconditional right to terminate.'" Id. at 244; (quoting Sons of Thunder, 148 N.J. at 419; and citing Bak-A-Lum Corp. v. Alcoa Bldg. Prods., Inc., 69 N.J. 123, 129-30 (1976) for its "finding that defendant's conduct in terminating contract constituted bad faith although conduct did not violate express terms of written agreement").

To establish a breach of the implied covenant of good faith and fair dealing, a party must demonstrate a "bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance." Amerada Hess, 168 N.J. at 251. "Bad motive or intention is essential . . . ." Ibid.

26

Here, the motion judge determined that Volvo extended, multiple times, the "various construction deadlines included in the 2016 LOI . . . in an attempt to allow [Nissani] to comply."  Moreover, Volvo's reallocation of "approximately $2[,000,000] from [Nissani]'s project to the [Las Vegas] project . . . [was] simply [Volvo] adjusting its revenue based upon a change in circumstances . . . [that it wa]s well within its rights to allocate . . . how it [saw] fit . . . ."  Ultimately, the judge determined, because of Nissani's "pattern of failed deadlines," Volvo elected to terminate the 2016 LOI.  While Nissani avers the motion judge failed to address this argument, the judge's factual findings dispel any notion of a bad motive or intention on behalf of Volvo and lead inexplicably to the conclusion that there was no breach of the implied covenant of good faith and fair dealing.

Moreover, Nissani's reliance on Bak-A-Lum is misplaced because that case is factually distinguishable from this matter.  In Bak-A-Lum, plaintiff was ALCOA's exclusive distributor of "aluminum siding and certain related products."  Bak-A-Lum, 69 N.J. at 126.  ALCOA had no issue with plaintiff's production, or sales of its product.  Id. at 126-27.  In January or February 1969, ALCOA decided to expand the number of distributors for its product.  Id. at 128.  ALCOA did not communicate this decision to plaintiff, ibid., and, instead,

knowingly encouraged plaintiff to enter into a long-term lease. Id. at 127. ALCOA terminated its "exclusive" agreement with plaintiff in January 1970 by appointing additional distributors. Ibid. The trial judge: (1) found ALCOA failed to timely communicate its decision to terminate the "exclusive" agreement with plaintiff, id. at 128; (2) found ALCOA's actions "be[spoke] a certain hypocrisy as well as ruthlessness . . . ," ibid.; (3) "surmised" that the reason ALCOA had concealed its intentions was to preserve plaintiff's sales during the months before the new distributors were put into place, ibid.; and (4) ALCOA induced plaintiff, just before termination, to place a "very heavy order for that time of year," ibid. The New Jersey Supreme Court held:

> In such circumstances [ALCOA]'s selfish withholding from plaintiff of its intention seriously to impair its distributorship although knowing plaintiff was embarking on an investment substantially predicated upon its continuation constituted a breach of the implied covenant of dealing in good faith . . . .
>
> [Bak-A-Lum, 69 N.J. 130.]

Here, unlike in Bak-A-Lum, the motion judge found: (1) Nissani's performance was not satisfactory; (2) Volvo extended deadlines, "multiple times" to allow Volvo to comply; and (3) Volvo reallocated revenue based on a change in circumstances. These findings belie any notion that Volvo: had a poor "attitude"; "a certain hypocrisy"; "ruthlessness"; or substantially induced

28

Nissani; or acted in a "selfish" manner, which were critical findings in <u>Bak-A-Lum</u>.

Moreover, Nissani argues this matter is similar to <u>Bak-A-Lum</u> because Volvo interacted with others regarding a dealership project in Las Vegas and Volvo's ultimate use of funds for that project that were earmarked for the Nissani project, revealed that Volvo was "deceitful." Further, he asserts Volvo's email, sent weeks before termination, "encouraged him to proceed" and was done "at the very same time [Volvo] was surreptitiously working to contrive an excuse to terminate the 2016 LOI."

However, this argument misses the mark because Nissani failed to explain why Volvo's communications regarding the Las Vegas project were improper. Moreover, Nissani's argument ignores his own failure to meet deadlines, an express reason allowing termination under the 2016 LOI, and his July 31, 2017 email that proposed to extend the deadlines beyond those provided in the 2016 LOI.

## C.

Nissani contends the motion judge erred in finding the proposed dealership was "not covered under the CFA." We disagree.

A-0640-22

"The CFA makes [certain] acts unlawful, in connection with the sale or advertisement of merchandise . . . ." DepoLink, 430 N.J. Super. at 337. "The term 'merchandise' . . . include[s] any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." Ibid. (quoting N.J.S.A. 56:8-1(c)).

Nissani's failure to establish "any material fact in dispute" that the "Volvo Retailer Agreement" was "offered, directly or indirectly to the public for sale" is fatal to his claim.

"We have previously indicated that 'the public,' as used in th[e] definition of 'merchandise,' [N.J.S.A. 56:8-1(c),] refers to 'the public at large.'" Princeton Healthcare Sys. v. Netsmart N.Y., Inc., 422 N.J. Super. 467, 473 (App. Div. 2011).

The opportunity for a "Volvo Retailer Agreement," which led to the execution of the 2014 LOI and 2016 LOI, was not an opportunity offered to the "public at large." Volvo approached Nissani because of his nearly twenty years of award-winning experience in dealership design and operating car dealerships. There was no public involvement. Instead, the LOIs involved a commercial agreement between two experienced commercial entities.

The cases cited by Nissani are unavailing because each case turns on the merchandise being offered to the public at large. See All The Way Towing, LLC v. Bucks Cnty. Int'l, Inc., 236 N.J. 431, 447 (2019) ("To promote consistency in the application of the requirement that a product be offered to the public when evaluating a private individual CFA action, we hold that the availability requirement can be met by showing that any member of the public could purchase the product or service, if willing and able, regardless of whether such a purchase is popular."); Kavky v. Hebalife Int. of Am., 359 N.J. Super. 497, 499 (App. Div. 2003) (applying the CFA to "plaintiff's purchase of a franchise or distributorship offered by defendants in advertising addressed to the general public at large."); Marasico v. Campanella, 298 N.J. Super. 491, 499 (App. Div. 1997) (applying the CFA provided "the disputed contract involves goods or services generally sold to the public at large . . . ."); Morgan v. Air Brook Limo., Inc., 211 N.J. Super. 84, 100 (Law Div. 1986) (applying the CFA when the "franchise [is] offered for sale to the general public . . . .").

Based on well-settled law, we affirm the dismissal of Nissani's CFA claim as the CFA is inapplicable to the parties' transaction.

D.

31

Nissani argues the motion judge "erred in rejecting Nissani's evidence of lost profits as lacking 'reasonable certainty.'" We disagree.

In Schwartz v. Menas, the New Jersey Supreme Court "reject[ed] a per se ban on claims by new businesses for lost profits damages . . . ." 251 N.J. 556, 561 (2022). "Claims for lost profits damages are governed by the standard of reasonable certainty." Ibid. "A trial court should undertake a fact-sensitive analysis of the evidence offered by a new business when it determines a motion to bar such a claim." Ibid. "'[L]ost profits may be recoverable if they can be established with a reasonable degree of certainty,' but '[a]nticipated profits that are remote, uncertain or speculative . . . are not recoverable.'" Ibid. (quoting Passaic Valley Sewerage Comm'rs v. St. Paul Fire & Marine Ins. Co., 206 N.J. 596, 609-10 (2011) (quoting Perth Amboy Iron Works Inc. v. Am. Home Assurance Co., 226 N.J. Super. 200, 224 (App. Div. 1988))).

We review a trial court's evidentiary determination for abuse of discretion. Menas, 251 N.J. at 570 (citing Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019)).

Here, we conclude the motion judge did not abuse his discretion in finding Nissani "failed to show lost profits with any reasonable degree of certainty." The judge determined that Nissani's expert's opinion was a "net opinion [and]

32

insufficient . . . ."  In conducting a "fact-sensitive analysis" the judge found the expert's use of "performance data [from] several of [Nissani]'s dealerships . . . [for] a period ending in 2014" resulted in "conjecture" because "the proposed dealership would have operated from approximately 2018 onwards, under very different economic conditions which would have led to a vastly different dealership performance."  Moreover, the judge noted "[t]he use of performance numbers prior to 2014 came in spite of the fact that [Nissani] operated at least five dealerships through the year 2020 . . . ."  Further, the judge found "the [r]eport state[d] an exorbitant year-over-year growth rate . . . [that wa]s far from [Volvo's] sales figures in its experience selling Volvo cars."  Ultimately, the judge concluded "[t]he numbers used in the [r]eport [we]re vastly inflated and from an irrelevant time period.  Simply put, the [c]ourt c[ould ]not conclude that [Nissani] calculated [hi]s lost profits with reasonable certainty; [the] numbers [we]re pure conjecture which lack[ed] a sufficient basis in existing data."

In the absence of evidence of lost profits, established with a reasonable degree of certainty, there can be no recovery.  Id. at 561.

E.

Nissani contends the motion judge erred in dismissing his claim for unjust enrichment. We disagree.

"To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." VGR Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994) (citations omitted). "The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant . . . . " Ibid.

Here, the parties had an express contract, the 2016 LOI. "Unjust enrichment is not an independent theory of liability but is the basis for a claim of quasi-contractual liability." Goldsmith v. Camden Cnty. Surrogate's Off., 408 N.J. Super. 376, 382 (App. Div. 2009) (internal quotations omitted). "It has been said that '[q]uasi-contract liability [should] not be imposed . . . if an express contract exists concerning the identical subject matter.'" Shalita v. Twp. of Washington, 270 N.J. Super. 84, 90 (App. Div. 1994) (alterations in original) (quoting Suburban Transfer Serv. v. Beech Holdings, Inc., 716 F.2d 220, 226-27 (3d Cir. 1983)); see also C.B. Snyder Realty Co. v. Nat'l Newark & Essex Banking Co. of Newark, 14 N.J. 146, 163 (1953) (quoting Moser v. Milner

Hotels, Inc., 6 N.J. 278, 280-81 (1951) ("An implied contract cannot exist when there is an existing express contract about the identical subject.")). Since the 2016 LOI is an express contract, we are satisfied that Nissani has no legal basis to maintain a claim for unjust enrichment.

Factually, the motion judge determined there was "no . . . evidence of unjust enrichment in the record." Nonetheless, we are satisfied Nissani cannot maintain a claim for unjust enrichment based on the express contract per the 2016 LOI and affirm the motion judge's order but for different reasons. See Isko, 51 N.J. at 175.

To the extent we have not addressed any of Nissani's remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0640-22